**In re CENTENNIAL TECHNOLOGIES LITIGATION.**

**No. Civ.A. 97–10304 REK.**

United States District Court,
D. Massachusetts.

May 14, 1999.

Glen DeValerio, Norman Berman, Berman, DeValerio & Pease, Boston, MA, David Bershad, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Jack G. Fruchter, Fruchter & Twersky, New York City, Stanley Bernstein, Bernstein Liebhard & Lifshitz, LLP, New York City, USA, Nancy F. Gans, Moulton & Gans, LLP, Boston, MA, Stephen Moulton, Moulton & Gans, Boston, MA, for Ronald Schwartz, plaintiff.

David Bershad, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Jack G. Fruchter, Fruchter & Twersky, New York City, Stanley Bernstein, Bernstein Liebhard & Lifshitz, LLP, New York City, USA, Nancy F. Gans, Moulton & Gans, LLP, Boston, MA, Stephen Moulton, Moulton & Gans, Boston, MA, for David Finkelstein, plaintiff.

Jeffrey C. Block, Berman, DeValerio & Pease, Boston, MA, for Sal Latorraca, Robert Blashka, Dr., Stephen Campbell, Barbara Ann Korns, Ronald Rees, Arnold Korelitz, Myer Shapiro, Karl Bauknight, Sherril Eapen, Sheeba Cherian, Leon Troll, Robert Weiss, Michael Sorkin, David E. Hill, consolidated plaintiffs.

Glen DeValerio, DeValerio & Pease, Boston, MA, for Devereux Green Hill, Robert J. Suarez, Irving Gurak, Anthony Kalioros, Leon North, David Waikus, Stephan Eggly, Gordon Sokich, Rosen & Yampolsky Partnership, Jonathan Boms, Harry Curry, Robert Robinson, Albert Shapiro, Stanton L. Triester, Carl Chaikin, Carl Chaikin IRA, Susan Chaikin, Cliff Associates, Pat V. Caputi, Freeman Family Partnership, MBR Produce Corp. Retirement Plan, Douglas Freeman, Trustee, Eugene Shapiro, WHU Enterprises, Inc., Marsha J. Taylor, James Aboud, Robert H. Wittemeyer, consolidated plaintiffs.

Norman Berman, DeValerio & Pease, Boston, MA, for Barbara Strunk, Richard Strunk, Manuel de Almeida, Ines de Almeida, consolidated plaintiffs.

Glen DeValerio, Jeffrey C. Block, DeValerio & Pease, Boston, MA, for Steven S. Siegelaub, consolidated plaintiff.

Glen DeValerio, Jeffrey C Block, Matthew Miller, Berman, DeValerio & Pease, Boston, MA for Charles Philips, derivatively on behalf of Centennial Technologies, Inc., consolidated plaintiff.

Thomas G. Shapiro, Edward F. Haber, Shapiro, Grace & Haber, Boston, MA, for John M. Babington, Howard P. Schwartz, Miriam Thurm, Felix Smolensky, Yaakov Glatter, Max Bruysschaard, Jennifer L. Ellis, consolidated plaintiffs.

Thomas G. Shapiro, Edward F. Haber, Michelle H. Blauner, Shapiro, Grace & Haber, Boston, MA, for Edward Campanelli, Christine Campanelli, Robert Bernard, consolidated plaintiffs.

Edward F. Haber, Shapiro, Grace & Haber, Boston, MA, for Morris Weinstein, Moshe Ariel, consolidated plaintiffs.

Thomas G. Shapiro, Michelle H. Blauner, Shapiro, Grace & Haber, Boston, MA, for Jessie B. Carnevale, Stanley Egelberg, consolidated plaintiffs.

Ralph M. Stone, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, Howard D. Finkelstein, Finkelstein & Associates, San Diego, CA, Stephen Moulton, Moulton & Gans, Boston, MA, for William Karges, Jr., Steven Goldman, Randi Warren, M.D., consolidated plaintiffs.

Gretchen M. Van Ness, Boston, MA, Robert C. Schubert, Schubert & Reed LLP, San Francisco, CA, for Lori L. Sanders, consolidated plaintiff.

Gretchen M. Van Ness, Boston, MA, for Earl L. Mitchell, consolidated plaintiff.

Peter A. Lagorio, Gilman & Pastor, Boston, MA, Saul Roffe, Sirota & Sirota, New York City, for JCT Design Enterprises, Inc., consolidated plaintiff.

Murray Miller, Miller & Miller Ltd., Phoenix, AZ, for Kantial R. Patel, Ranjan K. Patel, consolidated plaintiffs.

Marc Redlich, Law Offices of Marc Redlich, Boston, MA, for Anatole Geiche, consolidated plaintiff.

Samuel Kornhauser, Law Offices of Samuel Kornhauser, San Francisco, CA, for Marty Burstein, Robert Boorstein, Dr., Richard Baum, Urmila Bhargava, Stanley H. Bigelow, Robert Boone, Shirley L. Boone, Jeffrey Bruno, Robert Burke, John Cassetti, Ralph Clock, Rachanee Clovis, Elliot Cohen, Dr., Muriel Cohen, Thomas Conrad, Dr., Phillip Crary, John Downward, William Dukes, Ronald Falk, Glenn Falkowski, Hermann Fasel, Charles Ferris, Joan Firestone, Leslie Gelman, Gene Griffin, Deborah Gruen, Janet Gustafson, Tom Herson, Mitchell Hirsch, Lorri Hirsch, Ken Kamins, Karin Kerns, David M. Kerr, David Komet, Jim Korth, Prem Kumar, Clark Lagow, John Landis, Larry L. Likover, Dr., John G. Lowe, Dawn Luber, David Mann, Emerson Marsh, Laveta Marsh Revocable Trust, Don L. McGinnis, Edward Meece, James Meeker, Steve Molis, Patricia Newcombe, Robert Newcombe, Rakesh Parikh, Patrick Peavy, Dr., Pentz Revocable Living Trust, Michael Radigan, Ronald A. Remick, Joseph E. Rizk, Paul E. Romano, Judith A. Romano, William Ryan, Glenn Scott, Craig Seger, Melvin Selznick, Curt Shuey, Charles Smith, Geoffrey Smith, Townsville Trading, Ltd., Prasad Srinivasan, Douglas W. Stone, Mark Susnow, Bill Tifft, Henry W. Tooke, Paul Vignale, Victor Vizitei, Jim Wahl, William J. Walton, Jean Williams, Gordon Wong, consolidated plaintiffs.

John F. Cullen, Cullen & Resnick, Boston, MA, for James M. Murphy, Jr., defendant.

Dennis M. Kelleher, Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Coopers & Lybrand, Coopers & Lybrand L.L.P., defendant.

Peter M. Saparoff, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Needham & Co., Inc., defendant.

Robert J. Muldoon, Jr., Sherin & Lodgen, Boston, MA, Christopher A. Duggan, Christopher A. Duggan, Smith, Duggan & Johnson, Boston, MA, James M. Wodarski, Sherin and Lodgen LLP, Boston, MA, Thomas G. McNeil, Lawrence G. Campbell, Dickinson, Wright, Moon, Van, Dusen & Freeman, Detroit, MI, David A. Brown, Sherin & Lodgen LLP, Boston, MA, Matthew J. Walko, Milton, MA, for Lawrence J. Ramaekers, defendant.

Robert J. Muldoon, Jr., James M. Wodarski, David A. Brown, Sherin and Lodgen LLP, Boston, MA, for Jay Alix and Associates, consolidated defendant.

Michael A. Collora, David M. Osburne, Dwyer & Collora, Boston, MA, for Thomas Kinch, defendant.

Stephen F. Murray, Spencer Kagan, Kagan & Kagan, P.C., Revere, MA, for Bond D. Fletcher, Mediajet, Inc., Suncrest Ltd, consolidated defendants.

John D. Donovan, Jr., Mark P. Spzak, Crystal D. Talley, Ropes & Gray, Boston, MA, for Lehman Brothers, Inc., consolidated defendant.

Albert F. Cullen, Jr., Boston, MA, for Presage Corp./BBC Computers, consolidated defendant.

## MEMORANDUM IN EXPLANATION AND PRACTICE AND PROCEDURE ORDER NO. 15

KEETON, District Judge.

### Next Scheduled Case Management Conference:

June 9, 1999, at 4:00 p.m.

Practice and Procedure Order No. 15 supplements Practice and Procedure Orders 3, 8, 9, 10, 12, 13, and 14 and modifies them only to the extent stated below.

## Memorandum in Explanation of Practice and Procedure Order No. 15

### I.

Pending for decision (among other motions that I am not prepared to decide at this point) are:

(1) Defendant Jay Alix and Associates' Motion for Summary Judgment with Respect to Plaintiffs' Respondeat Superior and Section 20(a) Claims (Docket No. 276, filed March 29, 1999), with Memorandum in Support (Docket No. 277). Plaintiffs filed a Memorandum in Opposition (Docket No. 293, filed April 22, 1999).

(2) Motion for Leave to File Reply Memorandum in Support of Jay Alix and Associates' Motion for Summary Judgment (Docket No. 294, filed May 3, 1999), with Reply Memorandum in Support of its Motion for Summary Judgment (Docket No. 295). The Motion to File a Reply Memorandum is ALLOWED.

### II.

Defendant, Jay Alix & Associates ("JA & A"), specializes in providing management and financial services to troubled companies. The highest ranking title within JA & A is "principal" (except that one of the principals is the "managing principal"). As of February, 1999, roughly twenty employees had the title of "principal," one of whom was defendant, Lawrence J. Ramaekers ("Ramaekers").

JA & A entered into a contract (the "Agreement") with defendant, Centennial Technologies ("Centennial"), in early 1997. Under this agreement, Ramaekers was to serve as the interim Chief Executive Officer ("CEO") of Centennial, which was experiencing financial difficulties. For the services of Ramaekers and other JA & A employees, JA & A was to receive an hourly fee, reimbursement of expenses, and an equity stake in Centennial. The Agreement contemplated an "independent contractor relationship" and specified that JA & A employees were not entitled to any of the benefits of Centennial employees. Docket No. 293, Ex. 1.

While serving as interim CEO of Centennial, Ramaekers conducted interviews with journalists concerning Centennial's prospects. Plaintiffs assert that Ramaekers made statements in these interviews that were in violation of Section 10(b) of the Securities Exchange Act ("the Exchange Act") and corresponding Rule 10(b)(5). Plaintiffs assert that JA & A is liable for these statements both under agency principles and also under Section 20(a) of the Exchange Act because it is a "control person" of Ramaekers.

### III. Standard Applicable to the Motion for Summary Judgment

In order to be entitled to summary judgment, in circumstances like those associated with the Motion of Jay Alix & Associates, now pending before the court, the movant must make a preliminary showing of the absence of any genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the movant satisfies this burden, then the nonmovant, must "demonstrate, through specific facts, that a trialworthy issue remains." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997).

Issues of fact are in "genuine" dispute if they "may reasonably be resolved in favor of either party." *Id.* Facts are "material" if they possess "the capacity to sway the outcome of the litigation under the applicable law." *Id.* The facts in genuine dispute must be significantly probative in order for summary judgment to be denied; "conclusory allegations, improbable inferences, and unsupported speculation will not suffice." *Id.*

### IV. Entity Liability

#### A. Introduction

My purpose in this section of this memorandum is to consider what outcome the Court of Appeals for the First Circuit will reach, and on what reasoning, if the issue

now before this court on vicarious liability of Jay Alix and Associates reaches the First Circuit for decision before any further development of relevant statutes or precedents occurs.

Defendants propose that we read Supreme Court and First Circuit opinions, including *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), *Dinco v. Dylex Ltd.*, 111 F.3d 964 (1st Cir.1997), and *Sheinkopf v. Stone*, 927 F.2d 1259 (1st Cir.1991) as limiting or modifying *In re Atlantic Financial Management, Inc. Securities Litigation*, 784 F.2d 29 (1986), *cert. denied, AZL Resources, Inc. v. Margaret Hall Foundation, Inc.*, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987).

In view of this contention of defendants, in probing the available guidance in precedents I begin with *Atlantic Financial Management*. The opinion, delivered by Justice (then Circuit Judge) Breyer, addressed a question certified by Judge Skinner of the District Court for the District of Massachusetts under 28 U.S.C. § 1292(b):

> The certified question concerns the relationship between a special section of the Securities Act of 1934, section 20(a), 15 U.S.C. § 78t(a), and various common law theories of vicarious liability (of which "apparent authority" is one). That section reads as follows:
>
> > *Every person who, directly or indirectly, controls any person liable* under any provision of this chapter or of any rule or regulation thereunder *shall also be liable* jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person acted in good faith and did not directly or indirectly induce the* act or acts constituting the *violation* or cause of action.
>
> (Emphasis added.)

The significance of this section here lies in the contrast between its proviso and the common law. The proviso requires a finding of liability unless the controlling person 1) "acted in good faith" and 2) did not "induce" the violation. By way of contrast, common law agency theories may impose liability upon a principal or an employer without these two preconditions. The case before us asks whether the Securities Act means that section 20(a) is an *exclusive* remedy. That is to say, does the existence of this section foreclose holding a principal (say, a corporation) or an employer (who 'controls' an agent or employee) 'vicariously' liable when the proviso's two conditions are not met?

The circuits seem to be split about the proper answer to this question. . . .

784 F.2d at 30.

The opinion then takes a position on one aspect of the split of authority and frames the remainder of the inquiry essential to answering the certified question for the case then at hand:

> . . . We have not previously considered whether, despite section 20(a), principals may be held 'vicariously' liable for the 'securities related' misrepresentations of their agents. *But cf. Holmes v. Bateson*, 583 F.2d 542, 560 (1st Cir.1978) (discussing related questions). We now consider this question; and we join the majority expressly—at least in respect to the common law "apparent authority" theory here at issue.
>
> Because there are several different common law agency theories that may lead to 'vicarious liability' and because not all courts use the same terminology in respect to each, it may help to clarify the exposition of our reasons if we divide this opinion into two parts. First, we shall explain the basis for liability that would exist in this, and similar cases, in the absence of section 20(a). Second, we shall ask whether, or when, the existence of section 20(a) might make a difference.

## I

In the absence of section 20(a) a corporate principal's (or employer's) 'vicarious' liability for the misrepresentations of an agent (typically an employee) must find its source in Securities Act § 10(b)—the statutory provision that makes it "unlawful for any person, directly or indirectly ... to use ... any manipulative or deceptive device" in connection with the purchase or sale of securities. The "majority rule" circuits have at least implicitly read these words as encompassing some kinds of vicarious liability. (See cases cited at pp. 30–31, *supra.*) And, the Supreme Court, while restricting the liability of *primary* actors to persons who act with *"scienter,"* *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), has nonetheless cited with approval cases imposing 'vicarious' liability upon corporations who employ those who knowingly or recklessly make misrepresentations. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 568, 102 S.Ct. 1935, 1943, 72 L.Ed.2d 330 (1982) (hereinafter *ASME* ), citing with approval *Holloway* [ *v. Howerdd,* 536 F.2d 690 (6th Cir.1976) ], *supra; Kerbs* [ *v. Fall River Industries,* 502 F.2d 731 (10th Cir.1974)], *supra.*

These legal facts are not surprising. The common law has long imposed vicarious liability upon principals arising from torts committed by their agents. Whether broad language, such as that found in the Securities Act, embraces such principles is a matter of statutory interpretation based upon congressional intent. *ASME,* 456 U.S. at 569–70, 102 S.Ct. at 1944–45. And, the courts have tended to read congressional statutes that impose tort-like liability to embrace at least some of these well established common law agency principles, where language permits and doing so furthers basic statutory purposes. *Id.* at 568, 102 S.Ct. at 1943 (liability imposed upon principals for antitrust violations committed by agents). The courts must also decide *which* common law rules apply under the statutory scheme. And, it will help our exposition if, for this purpose, we divide relevant agency liability rules into three different kinds.

First, the common law typically holds principals liable when an agent's tortious representation is *actually authorized,* whether the agent's authority be express or implied. *Restatement (Second) of Agency* §§ 7, 257 (1958); W. Seavey, *Handbook of the Law of Agency* § 91 (1964). Such liability is not of great practical importance when the principal is a corporation, however, for a corporation (its charter, bylaws, directors' actions, etc.) rarely, if ever, *actually* authorizes torts. (Indeed, were it to do so, the corporation might be 'directly' rather than 'vicariously' liable.)

Second, a corporation's liability for an agent's misrepresentations may rest upon a theory of *"apparent authority."* *Restatement (Second) of Agency* § 8; *cf. id.* at § 8B (a related, but distinguishable theory of 'estoppel'). The agent's tortious action, while not actually authorized by the corporation, appears so to those adversely affected. Vicarious "[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business provided to him." *ASME,* 456 U.S. at 566, 102 S.Ct. at 1942, quoting with approval from *Restatement (Second) of Agency* § 261, comment a, p. 571. Courts have commonly imposed liability based on "apparent authority" upon a corporation in both state and federal "misrepresentation" cases—particularly when the person making the misrepresentation is an important corporate official. *See* 10 R. Eickhoff, *Fletcher on Corporations* § 4886 (1978 & Supp.1985).

A third basis for imposing vicarious liability consists of what commentators have called *"inherent agency powers"* or (in the master/servant context) "respondent superior" or sometimes simply "the agent's position." *Restatement (Second) of Agency* § 8A; W. Seavey, *supra,* at § 8F and § 58. We shall for convenience refer to this basis of liability as "status based" (in contrast with "authority based") liability. This non-authority based vicarious liability rests upon certain important social and commercial policies. *See, e.g.,* W. Seavey, *supra,* at § 58 ("[T]he business enterprise should bear the burden of the losses created by the mistakes or overzealousness of its agents (because such liability) stimulates the watchfulness of the employer in selecting and supervising the agents."); and at § 61 ("[T]he principal, [having] ... the opportunity of investigating the agent ... should guarantee the [agent's] honesty"). The precise scope of "status based" liability is unclear, with liability often depending upon the relationship of the social policy to the type of "principal/agent" circumstance at hand. *Id.* at § 8F. A "master," for example, is not held vicariously liable (on these grounds) for the *torts* of a "servant" where the servant does not act for the purpose of serving his master but is on a 'frolic of his own.' *Restatement (Second) of Agency* § 235 (no liability when the servant acts "with no intention to perform it as a part or incident to a service on account of which he is employed"). Yet, a principal (even though not a 'master') is liable for tortious misrepresentations of an agent (even though not a 'servant') even if the agent "acts entirely for his own purposes, unless the [injured person] ... has notice of this." *Id.* at § 262.

The case before us is of the *second* kind; the *"apparent authority"* of a high corporate officer. There are strong reasons for believing that the 'direct or indirect' language of the Securities Act encompasses this kind of common law agency liability. For one thing, as between the corporation that has placed the official in a position to invoke its authority (though improperly) and a victim, it seems fairer that the former bear the burden of an uncompensated loss. Further, imposing such liability will encourage corporate officials to prevent unauthorized (but 'apparently authorized') misrepresentations, thereby helping to achieve an important Securities Act purpose. Moreover, both related state "misrepresentation" law (which the federal act leaves untouched, 15 U.S.C. § 78bb(a)), and federal cases (quoted by the Supreme Court with approval) apply "apparent authority" liability principles. *ASME,* 456 U.S. at 568, 102 S.Ct. at 1943, citing with approval *Holloway, supra; Kerbs, supra.* Thus, we have little doubt that, in the absence of section 20(a) we should read the Securities Act of 1934 as imposing vicarious liability upon a corporation for the "apparently authorized" misrepresentations of a high official.

784 F.2d at 31–32.

The opinion then turns to the question before the court in that case—"whether section 20(a) precludes the imposition of this kind of vicarious liability that would otherwise exist," *id.* at 32, and answers in the negative for four elaborated reasons. The concluding Part III of the opinion begins:

In sum, we conclude that section 20(a) does not preclude the assertion of liability—based on common law notions of "apparent authority"—against a corporation for the misrepresentations of an important corporate officer.

784 F.2d at 35.

## B. Framing the Issues for Decision in this Case

Plaintiffs may prevail against the Motion for Summary Judgment by showing either or both of two theories for holding JA & A legally responsible for Ramaeker's alleged

misrepresentations in the media interviews in which he was speaking for Centennial: *first,* if *Atlantic Financial Management* is still controlling, that Ramaekers was acting within common law notions of "actual authority," "apparent authority," or "status-based authority" for JA & A, or *second,* that JA & A was a control person of Ramaekers.

## C.  *Central Bank*

In *Central Bank,* the Supreme Court faced a situation in which the petitioner, Central Bank, had been held liable in the courts below for recklessly "aiding and abetting" a securities fraud. This reckless "aiding and abetting" was based upon the following conduct. Central Bank was the indenture trustee of bond issues. Its employees, after having been apprized of a possible drop in the value of the security for the bonds, failed to obtain an outside appraisal of the property. Then, when the issuer defaulted, the real estate was not sufficient security. *Central Bank,* 511 U.S. at 167–68, 114 S.Ct. 1439. Nothing in the Court's Opinion indicates that one or more of Central Bank's employees had deliberately delayed the appraisal in order to defraud the bond investors.

In determining whether liability under Section 10(b) could properly attach due to this conduct, the court held,

> [W]e again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute.

*Id.* at 177–78, 114 S.Ct. 1439. Thus, the Supreme Court was not willing to read into Section 10(b) a cause of action for conduct that did not amount to what the text of the statute prohibited—fraudulent or manipulative conduct.

JA & A asserts that, because Section 10(b) does not expressly provide for liability under agency principles, the reasoning behind *Central Bank* forbids holding JA & A liable under status-based liability principles.

I anticipate that the First Circuit, when and if it addresses this issue, will not reach the outcome proposed by JA & A for the following reasons.

■ *First.* The language of Section 10(b), although not explicitly saying so, implies that entities may be held liable under agency principles. Entities can act only through their officers and employees. *See Holmes v. Bateson,* 583 F.2d 542, 560 (1st Cir.1978). Therefore, if agency principles were not meant to be a viable basis for liability under Section 10(b), the text of Section 10(b) would need to be modified to declare, in effect if not precisely in these words, that it is unlawful for *natural persons* to engage in the prohibited conduct. That is not, however, what Section 10(b) provides. Section 10(b) provides for liability for any "person," which encompasses, by definition, "a natural person, *company,* government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a)(9) (emphasis added). Therefore, by necessity, Section 10(b) contemplates liability based upon agency principles.

JA & A, citing a footnote in *In re Fidelity/Micron Securities Litigation,* 964 F.Supp. 539 (D.Mass.1997), argues that an entity might be held liable for the acts of its servant or agent but only when the employee or agent is speaking "as" the entity. Apart from the footnote JA & A cites, I find no support for that proposed rule. It is not in accord with traditional agency principles and I do not interpret *Central Bank* as mandating that rule.

■ *Second.* Holding JA & A liable in these circumstances would not be analogous to holding Central Bank liable in *Central Bank.* In *Central Bank,* the court

was addressing whether conduct proved in that case, other than that prohibited by Section 10(b), might lead to Section 10(b) liability. The Court held that it could not. In this case, plaintiffs have proffered evidence upon which a reasonable jury might determine that Ramaekers knowingly made misleading statements. *See* Docket No. 277, Ex. E, pp. 132 *et seq.* Therefore, the underlying conduct allegedly committed in this case, in contrast to that in *Central Bank,* was fraudulent—conduct that Section 10(b) explicitly prohibits. Therefore, Central Bank's situation is not analogous to JA & A's situation. If plaintiffs can persuade a jury that Ramaekers' statements were fraudulent or manipulative, and that he was acting with (1) actual authorization, (2) apparent authority, or (3) within the scope of his employment for JA & A, then JA & A might properly be held liable under Section 10(b).

## D. Section 20(a) Liability

JA & A asserts that it is entitled to summary judgment on the Section 20(a) control-person liability claim because it did not, in fact, control Ramaekers. Considerable overlap exists between the control-person claim and the Section 10(b) claim, discussed above. The two provisions are not precisely the same, however, and so I will address whether JA & A is entitled to summary judgment on the Section 20(a) count.

Control is not defined in the Exchange Act, but in the regulations control is defined as "the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of [an entity], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (1990).

■ Most courts have applied a two-prong test to determine whether one person ("person" refers to entities as well as natural persons) controls another. "[A] control-person relationship exists whenever (i) the alleged control person actually exercised control over the general opera-

tions of the primary violator and (ii) the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated." *Farley v. Henson,* 11 F.3d 827, 835 (8th Cir.1993); *see also Donohoe v. Consolidated Operating & Production Corp.,* 982 F.2d 1130, 1138 (7th Cir.1992); *Bray v. R.W. Technology, Inc.,* Civ.A. No. 88-0470-Z, 1990 WL 44084 (D.Mass. April 3, 1990).

■ In circumstances such as those presented in the claim against JA & A, where the issue concerns an entity's control over its employee, courts have stated that the right to "discipline or influence, although short of actual direction, is sufficient to hold a *control person* liable." *Harrison v. Dean Witter Reynolds, Inc.,* 79 F.3d 609, 614 (7th Cir.1996); *see also Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1305 (10th Cir.1998). Thus, the law does not require, as JA & A is contending, that JA & A (acting through someone other than Ramaekers) told Ramaekers precisely what to say about Centennial.

JA & A has not borne its burden in moving for summary judgment of showing the absence of a genuine dispute of material fact. JA & A asserts that no reasonable jury could find that it had the requisite level of control over Ramaekers. The very relationship between JA & A and Ramaekers, however, makes it possible that JA & A did. The Agreement indicates that Ramaekers was an independent contractor at Centennial; he was still JA & A's employee. He therefore may have been acting with some degree of autonomy while at Centennial, but it is quite possible that he would have faced repercussions for his actions from JA & A. Therefore, summary judgment is not appropriate on the Section 20(a) count.

## ORDER

For the foregoing reasons, it is hereby ORDERED:

(1) Defendant Jay Alix and Associates' Motion for Summary Judgment with Respect to Plaintiffs' Respondeat Superior and Section 20(a) Claims (Docket No. 276, filed March 29, 1999) is DENIED. This Order is incorporated into Practice and Procedure Order No. 15, below.

(2) Motion for Leave to File Reply Memorandum in Support of Jay Alix and Associates' Motion for Summary Judgment (Docket No. 294, filed May 3, 1999) is ALLOWED.

## PRACTICE AND PROCEDURE ORDER NO. 15

### Next Scheduled Case Management Conference:

June 9, 1999, at 4:00 p.m.

Practice and Procedure Order No. 15 supplements Practice and Procedure Orders 3, 8, 9, 10, 12, 13, and 14 and modifies them only to the extent stated below.

Parts I–X are not modified except as they have been modified by Practice and Procedure Orders 3, 8, 9, 10, 12, 13, and 14 or are inconsistent with Part XI below and the Attachment to which it refers.

### XI.  Stipulation and Order for Tailored Jury Trial

Attached to this Practice and Procedure Order No. 15 is Practice and Procedure Order No. 16, a Stipulation and Order for Tailored Jury Trial.

## PRACTICE AND PROCEDURE ORDER NO. 16

### Stipulation and Order for Tailored Jury Trial

(Attached to Practice and Procedure Order No. 15 of May 14, 1999)

**IMPORTANT DATES**

*NEXT SCHEDULED CASE MANAGEMENT CONFERENCE.*

June 9, 1999, at 4:00 p.m.

*FINAL PRETRIAL CONFERENCE DATE.* 3:00 p.m., June 17, 1999.

*TRIAL DATE.* 9:00 a.m., July 12, 1999 (TRIAL DATE). If the trial date has not been fixed by an earlier order, the court usually determines the TRIAL DATE during the Final Pretrial Conference and sets the trial for a Monday within 14 to 28 DAYS from the FPTC date.

*OTHER IMPORTANT DATES.*

June 28, 1999

If Part VI applies, see VI.7, VI.9.

July 5, 1999

If Part VI applies, see VI.8.

July 8, 1999

See III.A.1, IV.A.2, IV.B.1, V.A.2 If Part VI applies, see VI.8.

TWO COURT DAYS before EACH DAY OF TRIAL

See V.B.1

BEFORE TRIAL COMMENCES

See V.B.1

DAILY DURING TRIAL

See V.B.5, V.F.1

### I.  *Statement of Aim*

The aim of this Stipulation and Order is to create a set of procedures tailored to fit the distinctive characteristics of this case and "to secure the just, speedy, and inexpensive determination of [this] action," Fed.R.Civ.P. 1. The parties and the court intend

(a) that "the mode and order of interrogating witnesses and presenting evidence" be such as will "(1) make the interrogation and presentation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment," Fed.R.Evid. 611(a),

(b) that "interim summations" by counsel be allowed from time to time as the presentation of evidence proceeds, in order to promote jury understanding of the evidence and the contentions of the parties, and

(c) that, with the consent of the parties or upon motion and hearing under Fed.R.Civ.P. 42(b), the court may order phasing of the trial "in furtherance of convenience" or when "conducive to expedition and economy," *id.*, and may receive a separate verdict on one or more separate issues before other issues are tried to the same jury.

## II. *Stipulations*

1. Recognizing the right of each party to insist that "the testimony of witnesses must be taken orally in open court," Fed. R.Civ.P. 43(a), the parties waive this right to the extent stated in this Stipulation and Order and agree that in this case direct examination of each witness will be presented by affidavit, unless as to a particular witness an exception is allowed by the court under the provisions of this Stipulation and Order.

2. The parties agree that the time allowed to each party, for proceedings within each of the categories listed, will be as stated in this paragraph, subject to any modification ordered by the court upon a showing of good cause. Within each of the three categories of time allowances, a party may allocate the allowed time as it sees fit.

| | Plaintiff(s) | Defendant(s) |
|---|---|---|
| A. Total for Opening Statements and All Summations (including interim Summations) | ___ hours | ___ hours |
| B. Total for Examination and Cross–Examination of All Witnesses | ___ hours | ___ hours |
| C. Total for Making and Arguing Motions and Objections Orally | ___ hours | ___ hours |
| SUM | ___ hours | ___ hours |
| TOTAL FOR THE CASE | ___ hours | |

(exclusive of time for the court's instructions to the jury, which may be given in part as the case proceeds, as "interim instructions").

[Do the parties wish to propose any other stipulations? The parties may wish to consider agreeing upon a time-limited trial—*see* Part VI below—and upon shorter time limits than the court would otherwise impose.

Paragraphs 3–5, below, are examples of other terms the parties may consider.]

3. At any time more than 30 days before the trial begins either party may serve upon another party [or parties] [and file with the clerk] an offer of judgment. If within 10 days after the service of the offer a party upon whom the offer is served accepts by written notice served on the offeror, the clerk will enter judgment accordingly. An offer not accepted within this time is no longer open, and evidence of an offer not accepted is not admissible at trial. If the offer is not accepted and the judgment finally entered is not more favorable to the offeree, the offeree will be liable to the offeror for stipulated damages for the costs of trial, in the sum of _____ thousand dollars, which shall be included in the final judgment as an addition to or offset of the amount otherwise due (or as a net amount due if the offset exceeds the amount of a judgment otherwise to be entered against the offeror).

4. A jury of [8] will be selected. No alternates will be selected. The parties stipulate that if the court finds it necessary to excuse one or more jurors for cause after trial has commenced, the trial may proceed through deliberations to verdict as long as at least 5 qualified jurors remain.

5. If the deliberating jury consists of 5 persons, the verdict must be unanimous; if 6, a 5–1 verdict will be accepted; if 7, a 6–1 verdict; if 8, a 6–2 verdict.

## III. *Order Regulating Trial*

### A. *Jury Selection*

1. At least 2 court days before trial commences, counsel jointly (or each separately) must file for use by the court during voir dire a list identifying parties, lawyers, and witnesses. The lists must be over-inclusive rather than under-inclusive in case of any doubt, in order to avoid

risks of loss of jurors during trial because of acquaintance with a person whose possible relationship to the case was not made known during voir dire.

2. [If para. II.4 is included in the Stipulations and defendants are separated into Group One and Group Two.] The plaintiff group will have 3 peremptory challenges and each of the two defendant groups will have 2 peremptory challenges. A panel of 15 will be seated and questioned by the court (including any voir dire questions proposed by the parties, either in advance or during voir dire, and found acceptable by the court). Whenever a panel member is excused for cause, another person will be called by the clerk to fill the vacant seat, and the voir dire will proceed. At the conclusion of voir dire, after 15 not subject to challenge for cause are seated, the court will invite each of the 15 panel members to speak about his or her personal background and experience (including such things as occupation, marital status, spouse occupation (if any), children, hobbies, reading interests). The parties will then deliver to the clerk in writing, simultaneously, their peremptory challenges. The first 8, in order of seating, who are not challenged will be the jury.

### IV. *Proposed Jury Instructions*

#### A. *Preliminary Interim Instructions*

1. Before testimony begins, the court will instruct the jury on the functions and roles of the jury and of counsel in the case, and on the jury's obligations to decide the case solely on the evidence presented, to refrain from discussing the case (with each other or anyone else), and to avoid contact with the parties and with published or broadcast accounts of the trial.

2. The court may also give preliminary instructions on the law applicable to the claims and defenses in the case. The court will advise the parties of its tentative decision on this matter before opening statements, and will offer the parties an opportunity to be heard. Any requests for preliminary instructions must be filed with the court at least 2 court days before trial commences.

3. The court may give interim instructions upon a determination of a need to do so to aid jury understanding. Requests by the parties for such instructions are invited, and the parties are encouraged to propose the content of requested instructions in written drafts.

#### B. *Final Jury Instructions*

1. The court will give the final charge orally and ordinarily expects to deliver a copy to the jury in writing. It will consist of the following components: (a) general instructions to guide the jury throughout its deliberations; (b) special interrogatories requesting the jury's findings on specific questions of fact and explanatory instructions on the law bearing specially upon the questions submitted in the special interrogatories; and (c) limiting instructions, including instructions as to evidence received against less than all the parties in the action. No general verdict will be requested. The court does not give, along with interrogatories, the type of instructions that are needed when the jury is to return a general verdict.

1(a). General Instructions: A draft of the court's proposed general instructions will be distributed on or before June 17, 1999. Any objections or proposed amendments must be served and filed within 10 court days thereafter.

1(b). Special Interrogatories and Explanatory Instructions on the Law: Initial requests for special interrogatories and explanatory instructions on the law must be filed on or before June 11, 1999.

2. Limiting Instructions: Limiting instructions may include instructions as to evidence received for a limited purpose or purposes, or against less than all the parties in the action. If the occasion for a limiting instruction can be anticipated, parties will be expected to have their requests prepared in advance in writing. If any evidence is received for a limited purpose,

a party seeking the benefit of a limiting instruction in the court's final instructions will have the burden of assuring that a copy of the court's oral instruction is delivered to the Clerk for inclusion in the final charge, and in the case of documentary evidence, for attachment to the exhibit. A form that may be used with exhibits is attached to this order as "Exhibit A."

C. Jury Deliberation: All jurors selected and not excused for cause at any time after selection will deliberate and the verdict must be unanimous, unless the parties have stipulated otherwise with the approval of the court.

## V. Procedure at Trial

### A. *Opening Statements*

1. Opening statement by the plaintiff(s) will occur before any evidence is presented in the presence of the jury.

2. Opening statement by each defendant will occur immediately after plaintiffs' opening statement, unless one or more defendants have elected otherwise by notice filed and served at least two days before trial commences.

3. In a lengthy trial, the court may allow Interim Statements from time to time to allow counsel to clarify issues for the jury.

### B. *Evidence*

1. Each party must give advance notice to the court and the other parties, before jury selection, of the identity of all witnesses whose testimony (by affidavit, by deposition, or by oral testimony in trial) it may offer during trial. At least two court days before it seeks to use the testimony of any witness, or on shorter notice for good cause shown, each party must advise the court and all other parties of its intent to use the testimony of the witness on the specified day. Except for good cause shown, no party will be allowed to use the testimony of a witness other than the witnesses already listed on the filings with the court before trial commences. Except for good cause shown, no party may introduce during direct examination documentary evidence other than those exhibits already listed with the court and furnished to the other parties before trial commences. These provisions with regard to documentary evidence do not apply to cross-examination.

2. Absent a showing of good cause, the court will not exercise its discretion under Fed.R.Evid. 611(b) to allow the subject matter of the cross-examination to extend beyond the subject matter of the direct examination and matters, admissible in evidence, affecting the credibility of the witness. A showing of good cause will also be required if the subject matter of the redirect is to be allowed to extend beyond matters covered on cross-examination. That a witness has come from a distance or will be unavailable later in the trial may be found to constitute good cause to allow a party to treat him or her as its witness during what would otherwise be cross-examination, and to extend the examination beyond the scope of direct.

3. Use of Depositions at Trial:

Except for good cause shown no deposition testimony may be introduced as direct examination, or during oral direct examination, other than those pages or portions thereof noted in previous filings with the court. This limitation does not apply to the use of deposition testimony in cross-examination.

4. Stipulations may be read at any time, unless otherwise ordered in a particular instance upon a showing of good cause.

5. At least one-half hour before commencement of trial each day, counsel must furnish the court reporter with a copy of any document from which counsel intends to read that day, except depositions to be read by two people in question and answer form. Documents to be used during cross-examination are excepted.

6. Whenever a single person is reading deposition testimony, in order to enable

jurors and the reporter to understand clearly, the reader will say "Question" before each question is read and "Answer" before each answer is read.

7. All documents or other non-testimonial evidence that will be admitted at least in part without objection are to be pre-marked as numbered exhibits. To effect the pre-marking and to avoid duplicative numbering, each of the parties will assign consecutive numbers to these documents, as follows: Plaintiff(s), 1–500; Group One Defendant(s), 501–999; Group Two Defendant(s), 1001–1,500. The term "Exhibits" is to be used only for documents or objects that are to be received without objection or have been received in evidence by court order over objection.

The term "Marked Items" will be used for documents and other items (for identification as they are referred to in the proceedings) that are not Exhibits. A lettering system must be used by each of the parties to pre-mark, as Marked Items (for identification), each piece of non-testimonial evidence it will offer to which objection has been made by the party against whom the document is sought to be admitted. The clerk will supply the parties with stickers to be used in pre-marking documents and other non-testimonial evidence, either as Exhibits or as Marked Items (for identification).

C. *Objections, Motions to Strike, and Conferences Out of the Hearing of the Jury*

1. Counsel have the court's permission at all times to interrupt proceedings merely to object or move to strike. Counsel need not state the ground(s) of objection unless the court asks for the ground(s), but (unless the court orders otherwise in a specific instance) counsel may without invitation by the court state the ground(s) merely by reference to a Rule designated by number, among the Federal Rules of Evidence. Also, unless otherwise ordered (as may be done, for example, when the court interrupts to sustain an objection

because valid grounds are obvious), counsel may state the grounds in customary legal jargon (*e.g.*, "hearsay," "irrelevant," "lack of essential foundation"). Counsel are not to go beyond a bare statement of the ground(s) in one of these ways; supporting or opposing arguments will not be stated in the hearing of the jury without the court's permission.

2. Offers of proof ordinarily will be received only after the jury has been excused for a recess or for the day.

3. Conferences out of the hearing of the jury will be held to a minimum. *They will never occur at the beginning of a court day unless that timing is unavoidable.* When the court has directed jurors to be present at a designated hour, counsel asking for a conference out of the hearing of the jury at that hour will be required to show good cause why the need should not have been anticipated so the jury could have been released early the preceding day and why the conference cannot be deferred until the end of the current day, or at least until the next recess.

4. Short conferences out of the hearing of the jury may be held at the side bar farthest from the jury box. The jury will be sent to the jury room if a more extended conference out of their hearing is required. The jury will be instructed to interrupt and tell the court immediately if any of the conversation at a side-bar conference is loud enough for any of them to hear.

D. *Rules of Proof*

1. The objection of interrogating counsel to an answer that is nonresponsive will usually be sustained. Objections by other counsel solely on the ground that an answer is nonresponsive will usually be overruled. Sustaining such an objection is likely to lead to a new question that elicits exactly the same information as was stated in the struck answer, and time is wasted. Of course, if some other valid ground of objection is added, a statement that the

answer was nonresponsive may be needed and appropriate to explain why no objection was made to the question.

2. The court ordinarily will not instruct a witness to "answer YES or NO" to (1) a multiple question, (2) a question that requires the witness to make or accept an inference or characterization rather than merely acknowledging or denying an observable fact, or (3) a question that is argumentative in form or in substance.

3. Questions framed to have more impact as arguments than as requests for testimony that the witness is competent to give are out of bounds. They will be excluded on objection and may be excluded on the court's initiative, without objection.

4. Ordinarily, questions asking one witness to comment on the credibility of another are out of bounds. A lawyer who wishes to ask such a question must make a request out of the presence of the jury for leave to do so.

[Do counsel wish to propose other Rules of Proof for this trial?]

### E. *Schedule*

1. The court will aim for conducting this trial 9:00 a.m. to 1:00 p.m. Monday–Friday.

2. This case will not be in trial on the following days: _____

### F. *Sequestration of Witnesses*

A person who is expected to testify as a witness in this civil action must not be present in the courtroom during the presentation of evidence (or have access to a transcript or summary of that evidence) except as follows:

1. Professional persons engaged by a party or its counsel for the purpose of offering testimony as witnesses having specialized knowledge or experience may be present whenever evidence is being received, unless otherwise ordered.

2. One representative of each party, designated by counsel to the court in advance of the trial as that party's representative, may be present throughout the trial.

3. A person who has testified and who is not expected to testify again for any party may be present in the courtroom after his or her testimony has been completed, but that person must not state or summarize his or her own testimony or the testimony of others to prospective witnesses.

4. Counsel must not state or summarize the testimony of others to any prospective witness (other than one within paragraph 1) and must not permit a prospective witness (other than one within paragraph 1) to read transcripts or summaries of previous testimony of other witnesses.

### G. *Miscellaneous Matters*

1. Documents filed in court during trial: A party filing a document in court rather than in the Clerk's Office must file, with the original, a copy of the first page. Each document will be given a docket number by the clerk.

2. All discovery is concluded.

3. Jurors will be permitted to take notes. Instructions will be given in the form of Exhibit B.

4. Drafts (not final) of interrogatories to the jury and the Charge will be distributed soon after requests of counsel have been filed (in accordance with Part IV–B above) and have been considered by the court. A final conference on the verdict and the charge will occur promptly after the evidence is closed and before arguments begin. The court expects that extensive consultation will have occurred previously and that this conference will be brief. Any requests or objections made to preserve a contention for appeal must, of course, be made after the charge has been given and before the jury commences deliberations.

## VI. *Time Limits*

These provisions regarding Time Limits apply only if the court specifically so orders. The other provisions of this Order Regulating Jury Trial ordinarily assure a trial of reasonable length. The court expects to invoke Part VI only if finding it likely that the trial would be longer than [5] court days without these provisions.

1.  Time limits provide an incentive to make the best possible use of the limited time allowed. The limits that the court may order, absent agreement, will not be as stringent as those the parties might agree would serve their mutual interests in achieving a shorter, less expensive, and better quality trial. The court encourages the parties to agree on limits before the procedures described immediately below are implemented.

2.  Absent agreement of the parties to time limits that are approved by the court, the court will order a presumptive limit of a specified number of hours for this trial, to be allocated equally between opposing parties (or groups of aligned parties) unless otherwise ordered for good cause.

3.  A request for added time will be allowed only for good cause. An explicit purpose of this provision is to create an incentive for using time exclusively on issues material to disposition on the merits.

4.  In determining whether to allow a motion of any party for an increased allotment of time, the court will take into account (a) whether or not that party has used the time from commencement of trial forward in a reasonable and proper way, in compliance with all orders regulating the trial, (b) the party's proffer with respect to the way in which the added time requested would be used and why it is essential to fair trial, (c) any other facts the party may wish to present in support of the motion, if determined by the court to be material, and (d) any opposing submission. The court will be receptive to motions for reducing or increasing allotted time to assure that allotments are fair among the parties and adequate for developing the evidence. Any party that makes only proper use of its time throughout the trial is assured that an extension will be allowed if more time is needed to present all its material and admissible evidence adequately.

5.  Presumptive allotments of time to a party will be stated as a total number of hours available to that party, rather than allocations of times for particular witnesses or proceedings. Thus, each party will be free, without a showing of good cause, to allocate time as that party chooses among different uses—opening statement, direct and cross-examination of various witnesses, closing argument, objections, and motions—as long as the party's total allotment is not exceeded.

6.  Time taken to argue objections will be charged against the time allocation of the party against whom the court rules, and will be allocated between parties if the court rules partly for and partly against the objecting party.

7.  No later than June 28, 1999, each party (or group of aligned parties) must serve on the opposing party (or group of aligned parties) and file its NOTICE OF DIRECT EXAMINATION (1) listing its witnesses and an estimate of the time to be used in direct examination of each witness, (2) listing the precise pages and lines of any deposition testimony to be offered during the case in chief, with time estimates for reading that testimony into evidence, (3) affidavits of any expert witnesses whose depositions have not been taken, fairly summarizing the substance of their expected testimony, fully disclosing every opinion to be expressed, and estimating the time of direct examination, and (4) listing all the exhibits it intends to offer and an estimate of time, if any, to be used in publishing each exhibit to the jury. If the expected content of direct examination and exhibits has not previously been disclosed, the NOTICE must include a fair summary of the content of each direct examination and each exhibit.

8. No later than July 5, 1999, each party (or group of parties) must serve and file its NOTICE OF CROSS–EXAMINATION estimating time to be used in cross-examination of each of the opposing party's listed witnesses. If any party, after seeing an opposing party's NOTICE OF DIRECT EXAMINATION, proposes to call additional witnesses or offer additional exhibits, it must, when serving and filing its NOTICE OF CROSS–EXAMINATION, also serve and file a SUPPLE-MENTAL NOTICE of DIRECT EXAMINATION, including time estimates. An opposing party's SUPPLEMENTAL NOTICE OF CROSS–EXAMINATION must be filed not later than TWO COURT DAYS BEFORE THE TRIAL DATE.

9. The parties are encouraged to confer and agree upon witness and exhibit lists and time limits for direct and cross-examination, and to file a stipulation no later than June 28, 1999 in lieu of the separate submissions otherwise required by paragraphs 7 and 8.

Part VI. Time Limits,
_____ does apply to this case.
_✓_ does not apply to this case.

*EXHIBIT A*

*EXHIBIT MARKING SLIP*

The attached document or object is Exhibit No. _____.

Instructions to the Jury:

You may consider this document or object as evidence only with respect to any party whose name is checked below. You may not consider this document or object as evidence with respect to any party whose name is not checked. If any limited purpose is set forth below then you may consider this document or object for that limited purpose only. If no limited purpose is set forth below, then you may consider this document or object for all purposes.

*EXHIBIT A*—Continued

*Party*

Plaintiff(s)

Group One Defendant(s)

*Limited Purpose*

*EXHIBIT B*

*INSTRUCTIONS TO JURORS ON NOTE–TAKING*

Members of the Jury:

You have the permission of the court to take notes during the evidence, the summations of attorneys at the conclusion of the evidence, and during my instructions to you on the law.

In many courts—probably in most—jurors are not permitted to take notes. The reasons are concerned with fear that taking notes may cause the jury, as a whole, to be less effective in serving as a completely fair and impartial factfinder. Because of the potential usefulness of taking notes, you will be permitted to take notes in this trial. For the purpose, however, of protecting against the possible disadvantages that have led many courts to order that notes not be taken, I am instructing you to observe the following limitations:

1. *Note-taking is permitted, not required.* Each of you may take notes. No one is required to take notes.

2. *Take notes sparingly.* Do not try to summarize all of the testimony. Notes are for the purpose of refreshing memory. They are particularly helpful when dealing with measurements, times, distances, identities, and relationships.

3. *Be brief.* Over-indulgence in note-taking may be distracting. You, the jurors, must pass on the credibility of witnesses; hence, you must observe the demeanor and appearance of each person on the witness stand to assist you in passing on his or her credibility. Note-taking must not distract you from that task. If

you wish to make a note, you need not sacrifice the opportunity to make important observations. You may make your note after having made an observation itself.

4. *Your notes are for your own private use only. Do not use your notes, or any other juror's notes, as authority to persuade fellow jurors.* In your deliberations, give no more and no less weight to the views of a fellow juror just because that juror did or did not take notes. Your notes are not official transcripts. Notes are valuable as a stimulant to your memory. They are personal memory aids, as are the notes of the judge and the notes of the lawyers. Each of us, including each of you, might make an error in observing, and might make a mistake in recording what we have seen or heard. You are not, therefore, to use your notes as authority to persuade fellow jurors of what the evidence was during the trial.

5. *Do not take your notes away from court.* At the end of each day, please place your notes in the envelope provided to you. A court officer will be directed to take the envelopes to a safe place and return them at the beginning of the next session on this case, unopened. At the conclusion of the case, after you have used your notes in deliberations, a court officer will collect and destroy them, to protect the secrecy of your deliberations.