In re LERNOUT & HAUSPIE
SECURITIES LITIGATION.

Gary B. Filler, et al., Plaintiffs,

v.

Jo Lernout, et al., Defendants.

Stonington Partners, Inc.,
et al., Plaintiffs,

v.

Carl Dammekens, et al., Defendants.

Paul G. Bamberg, et al., Plaintiffs,

v.

KPMG, LLP, et al., Defendants.

Janet Baker, et al., Plaintiffs,

v.

KPMG, LLP, et al., Defendants.

Nos. Civ.A. 00–CV–11589–PB, Civ.A. 02–
CV–10302–PB, Civ.A. 02–CV–10303–
PB, Civ.A. 02–CV–10304–PB.

United States District Court,
D. Massachusetts.

Aug. 19, 2002.

McCarty, Boston, MA, Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Wilmington, DE, for Paul G. Bamberg, Robert Roth, Donald B. Fletcher, Cherry F. Bamberg.

Terence K. Ankner, Kenneth J. Fishman, Bailey, Fishman & Leonard, Boston, MA, Kurt F. Gwynne, John G. Harris, Reed Smith LLP, Wilmington, DE, Karen C. Dyer, Boies, Schiller & Flexner LLP, Orlando, FL, Robert A. Nicholas, Michael T. Scott, Alan K. Cotler, Sean M. Halpin, Tracy Zurzolo-Frisch, Joan A. Yue, Reed Smith, LLP, Philadelphia, PA, for Janet Baker, James Baker, JK Baker LLC, JMBaker, LLC.

Susan E. Kaufman, Heiman, Aber, Goldlust & Baker, Wilmington, DE, for Jo Lernut.

Pamela E. Berman, Bryan A. Wood, Schnader, Harrison, Goldstein & Manello, Boston, MA, Daniel Waxman, Eric Rieder, Bryan Cave, LLP, New York City, for Roel Pieper.

John A. Gilmore, Nelson Callahan, Hill & Barlow, Boston, MA, for Bernard Berngnes.

Stephen E. Jenkins, Ashby & Geddes, Wilmington, DE, Douglas F. MacLean, Latham & Watkins, Newton, MA, Peter W. Devereaux, Latham & Watkins, Los Angeles, CA, for KPMG Intern.

Lewis H. Lazarus, Morris, James, Hitchens & Williams, Wilmington, DE, for KPMG U.S.

David H. Braff, Bradley A. Harsch, Philip L. Graham, Jr., Stephanie G. Wheeler, Sullivan & Cromwell, New York City, Theodore Edelman, Sullivan & Cromwell, London, England, Douglas H. Meal, Emily F. Klineman, Ropes & Gray, Boston, MA, for KPMG UK.

Kevin R. Shannon, Potter, Anderson & Corroon, LLP, Wilmington, DE, for KPMG Belgium.

Richard E. Bennett, Jack R. Pirozzolo, James J. Nicklaus, Wilcox, Pirozzolo &

Matthew J. Matule, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Paul J. Lockwood, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, George A. Zimmerman, Joanne Gaboriault, Skadden, Arps, Slate, Meagher, & Flom, LLP, New York City, for SG Cowen Securities Corp.

Henry A. Heiman, Heiman, Aber Goldlust & Baker, Wilmington, DE, for Jo Lernout.

James S. Dittmer, James O. Fleckner, Hutchins, Wheeler & Dittmer, Boston, MA, for Pol Hauspie, Nico Willaert.

Thomas W. Evans, Janet B. Fierman, Robert M. Cohen, Cohen & Fierman, LLP, Boston, MA, for Mercator & Noordstar NV.

Gregg Shapiro, Kevin J. Lesinski, Choate, Hall & Stewart, Boston, MA, Michael P. Carroll, William Fenrich, Davis, Polk & Wardwell, New York City, for KPMG, LLP.

Robert J. Kaler, Gadsby & Hannah, LLP, Boston, MA, for Flanders Language Valley Foundation.

## MEMORANDUM AND ORDER

SARIS, District Judge.

These actions involve a dispute over the proper standard for evaluating the liability of an outside independent auditor for widespread accounting fraud by senior officers of a corporation. In this securities class action and the three related cases, Plaintiffs allege that various affiliated KPMG entities committed accounting fraud at now-bankrupt Lernout & Hauspie Speech Products, N.V. ("L & H"), a Belgian speech recognition software corporation. The defendant KPMG entities are KPMG Bedrijsrevisoven in Belgium ("KPMG Belgium")[1], KPMG LLP in the United States ("KPMG US")[2], KPMG in Great Britain ("KPMG UK")[3], KPMG in Singapore ("KPMG Singapore")[4]; and the international association ("KPMG International")[5] of which the other defendants are all members.[6]

All plaintiffs allege that KPMG Belgium should be held liable as a primary violator for issuing signed, unqualified audit opinions in 1998 and 1999, allegedly with actual knowledge, or reckless disregard, of false and misleading information contained in L & H's quarterly and annual reports. None of the other KPMG defendants signed the audit report. However, all plaintiffs argue that the involvement of KPMG UK and KPMG U.S. in conducting audits and preparing L & H's financial disclosures also triggers primary liability.[7] One of the

---

1. All plaintiffs have named KPMG Belgium as a defendant.

2. All plaintiffs have named KPMG U.S. (usually referred to as "KPMG L.L.P.") as a defendant.

3. All plaintiffs have named KPMG UK as a defendant.

4. Only the Filler plaintiffs have named KPMG Singapore as a defendant.

5. Only the Bamberg plaintiffs have named KPMG International as a defendant.

6. Filler plaintiffs also name Samjong KPMG Group in Korea as a defendant. However, Filler plaintiffs stated at the June 13, 2000, hearing that KPMG Korea had not yet been served with a complaint, and this Court has not yet received any of KPMG Korea's responsive pleadings. Therefore, I will not consider the merits of Filler plaintiffs' claims against KPMG Korea in this opinion.

7. The Dragon and Dictaphone shareholders make several "extra" factual allegations against KPMG U.S. and KPMG Belgium that are absent from the lead plaintiffs' complaint. Specifically, the Bakers, Fillers, and Bambergs allege KPMG partners from Belgium and the U.S. made false and misleading oral statements to Dragon Systems shareholder representatives during a March 22, 2000 con-

Dragon and Dictaphone shareholders also names KPMG Singapore as a defendant for its alleged provision of false audit information to KPMG Belgium. Another of the Dragon and Dictaphone shareholders names KPMG International as a defendant on a theory of vicarious liability.

The KPMG entities have moved to dismiss the Complaints on the ground that they fail to state a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67 (1995) (codified at 15 U.S.C. §§ 78u–4 & –5). After hearing on June 13, 2002, and a review of the extensive briefing, the Motions by KPMG U.S. and KPMG Belgium to Dismiss are **DENIED**. The Motions by KPMG Singapore, KPMG International, and KPMG UK are **ALLOWED**.

## I. BACKGROUND

Unless otherwise noted, the facts recited below are drawn from the Lead Plaintiffs' First Consolidated and Amended Class Action Complaint.[8] This Court's earlier opinion in this case, *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74 (D.Mass. 2002) ("*Lernout I* "), analyzes in detail the general allegations of fraud against the Senior Officers of L & H, and the sequence of events leading up to the company's downfall in the fall of 2000. Familiarity with that opinion is assumed. The facts provided here focus only on those allegations that relate directly to the KPMG defendants.

### A. Parties

L & H is a Belgian corporation with its United States executive offices in Bur-

lington, Massachusetts. L & H develops and licenses speech technologies, including speech recognition software. Prior to its Chapter 11 bankruptcy filing on November 29, 2000, L & H was listed and traded on the NASDAQ stock exchange. Plaintiffs have not named L & H as a defendant.

The three individual lead plaintiffs in this action, Quaak, Po, and Leibinger, three Europeans, purchased common stock between April 28, 1998, and November 8, 2000 (the "Class Period"). Plaintiff MM Holdings, Inc. purchased L & H options during the Class Period. Filler, Baker, and Bamberg are former shareholders of Dragon Systems, Inc. who exchanged their shares for L & H stock as part of L & H's merger with Dragon in June 2000. Stonington plaintiffs are entities that sold L & H their 96% ownership stake in Dictaphone in May 2000 in exchange for L & H stock.

Several KPMG partners were prominent in assisting L & H during the class period. William Van Aerde, Paul Behets, and Stefan Huysman were among KPMG Belgium's principal auditors. Robert McLamb, a KPMG U.S. partner, worked at the KPMG UK office until January 2000 (¶¶ 233, 277), and then transferred to KPMG US. James Boyer was the KPMG U.S. partner in charge of assisting L & H from the Boston office.

### B. KPMG's Alleged Role in the Fraud

KPMG Belgium became L & H's outside auditor in 1991, when KPMG acquired the Belgium accounting firm of Behets, Boes & Co. Plaintiffs allege that various KPMG offices were exposed to an escalating pag-

---

ference call related to an anticipated merger. The fourth related-party plaintiff, Stonington Partners, claims that in connection with a contemplated merger, KPMG Belgium and KPMG U.S. partners orally made a series of material misstatements to its shareholder rep-

resentatives during February and March of 2000.

8. Parenthetical citations labeled "¶___" without indicating a specific document refer to paragraphs in Lead Plaintiffs' Complaint.

eant of "red flags" from 1998 to 2000, plainly indicating that misconduct was afoot. During the same period, KPMG defendants allegedly helped L & H to carry out securities fraud by issuing "clean" or unqualified audit reports, and by helping L & H draft various financial disclosures filed with the SEC.

Plaintiffs place relatively little emphasis on KPMG's activities during the years 1997 and 1998. During both years, two KPMG offices (Belgium and US) were described as L & H's principal auditors on its Annual Reports to Shareholders. (¶ 229). KPMG offices are also alleged to have "actively participated" in reviews and audits of L & H financial statements. (*Id.*). Plaintiffs point to one occasion on which a KPMG auditor expressed concern about L & H's conformity with U.S. GAAP. Specifically, on October 19, 1998, Virginia-based KPMG U.S. auditor David Milligan sent an e-mail to Boyer (the KPMG U.S. partner based in Boston) expressing doubt that Globalink, a L & H subsidiary, was complying with U.S. GAAP "in material respects." (¶ 299). Plaintiffs do not cite with particularity any other instances where KPMG officials were directly informed (or informed others) of financial improprieties during those years.

L & H's alleged fraud—and KPMG defendants' participation—began gathering momentum in the spring and summer of 1999. On April 9, 1999, KPMG Belgium signed a "clean" audit opinion on L & H's 1998 financial disclosures to the SEC. Like many standard, unqualified audit opinions, the report consisted of three short paragraphs—the introduction, the scope, and the opinion—reciting in boilerplate language that KPMG conducted its audit "in accordance with generally accepted auditing standards" and that in its opinion, L & H's financial statements were "present[ed] fairly, in all material respects ... in conformity with generally accepted accounting principles." (¶ 79). *See* Charles R. Wright, *Understanding and Using Financial Data* 82 (1996); American Institute of Certified Public Accountants, *Understanding Audits and the Auditor's Report: A Guide for Financial Statement Users* 16 (1996). KPMG Belgium agreed to append a copy of the opinion to L & H's 1998 Annual Report on Form 20–F, which was filed with the SEC on June 30, 1999. Moreover, throughout this period, KPMG auditors allegedly helped L & H prepare its annual and quarterly financial statements (although the quarterly filings were not subjected to a formal, publicly disclosed audit). (¶ 235). L & H eventually conceded that FY98 revenues reported on Form 20–F were overstated by 15%. (¶ 313).

Also beginning in the summer of 1999, "red flags" regarding L & H's financial improprieties began waving before various KPMG officials. On June 23, 1999, KPMG U.S. informed KPMG Belgium that against KPMG's recommendation, L & H had chosen to reclassify obsolete inventory worth $444,000 on 1998 Form 20–F instead of writing it off. (¶ 300). Around the same period, KPMG USA Group decided to perform "heightened" review procedures on L & H's financial statements for the second quarter of 1999. (¶ 300). At a meeting held July 23, the KPMG USA Group mentioned several problems with collectability from distributors and revenue recognition, and reiterated its concern over the $444,000 of obsolete inventory. (¶ 123). Three days later, Van Aerde sent an e-mail to Bastiaens of L & H, asking that the obsolete inventory carry-over and other issues be resolved before distribution of the press release announcing second quarter 1999 results. (¶ 303). In August, after learning that L & H's internal audit committee did not meet until thirteen days after the issuance of the second quarter press release, KPMG advised L & H about

the need for an internal auditor and a stronger internal control staff. (¶¶ 290, 309). On September 30, Van Aerde wrote a confidential memorandum to McLamb stating that certain "scope limitations" had been imposed when KPMG conducted its investigation of the independence of the LDCs, and one of the LDCs in fact had refused to confirm its independence. (¶ 271). On October 10, Oh Kwon, a KPMG Korea partner, sent both Dammekens and Van Aerde an e-mail expressing serious concerns over the legitimacy of recognizing revenue from the Korean sales. (¶ 262). On October 20, Boyer wrote a memo documenting several respects in which L & H had failed to follow its own accounting policies. (¶¶ 298–99, 303, 307). Finally, on November 17, Van Aerde informed an L & H officer that the $444,000 of obsolete inventory was still being carried on L & H's books despite numerous requests by KPMG that it be written off (¶ 306).

Throughout 2000, additional "red flags" came to light alerting various KPMG auditors to L & H's financial improprieties. On January 5, 2000, McLamb sent L & H's Dammekens an e-mail enumerating various revenue recognition problems in the "draft" agreements for the fourth quarter of 1999. He suggested signing and backdating such contracts to address the problem. (¶ 260). On January 29, McLamb sent Van Aerde and Huysman an e-mail noting that payments from several Korean LDCs came from the same bank account, and stressed the importance of finding out their true identities. (¶ 275). Also in January, the SEC commenced an informal inquiry into L & H's accounting practices. (¶ 274). By April, the SEC began to specifically request documents related to its probe of L & H's accounting. (¶ 274). On May 8, McLamb sent Van Aerde a memo noting several respects in which L & H had failed to establish and follow formal written accounting procedures. (¶ 294).

On June 26, McLamb sent Van Aerde an e-mail noting that KPMG had not yet performed audit procedures necessary to establish the independence of the LDCs. (¶¶ 279–80).

Despite this drumbeat of accounting problems, on April 27, 2000, KPMG Belgium signed a "clean" audit opinion on L & H's financial disclosures for the previous year. As before, the opinion consisted of three short boilerplate paragraphs attesting to the compliance of both KPMG's audit and L & H's financial disclosures with generally accepted auditing standards and principles. Once again, KPMG Belgium agreed to append a copy of the audit opinion to L & H's 1999 Form 10–K, filed with the SEC on June 30, 2000. Meanwhile, KPMG auditors continued to help L & H prepare its SEC filings. (¶ 235). L & H eventually conceded that revenues for FY99 reported on Form 20–F were overstated by 103%. (¶ 313).

L & H's public image began to deteriorate after July 2000, when its reportedly huge revenue increases in Asia triggered an investigation by the *Wall Street Journal.* On August 8, 2000, the *Journal* reported that several companies listed as customers by L & H in Asia either denied doing business with L & H or claimed that they did much less business with L & H than L & H had reported. News of the SEC investigation of L & H became public on September 21, 2000, just as the *Journal* began raising more questions about L & H's Asian transactions. The Brussels-based EASDAQ, the European stock exchange, launched a formal investigation of L & H on or about September 26, 2000. By late October, further revelations about L & H's related party transactions had surfaced. By press release dated November 9, 2000, L & H announced the restatement of its 1998, 1999, and Q1–Q2 2000 financial statements because of accounting

"errors and irregularities." L & H also reduced its third quarter 2000 revenue estimates by $40 million. Lernout and Hauspie then resigned as executive co-chairs, and Willaert stepped down as Managing Director. By the end of November 2000, KPMG had withdrawn both its 1998 and 1999 audit reports, and L & H had filed for bankruptcy under Chapter 11.

## II. LEGAL ANALYSIS

### A. *Standard for a Motion to Dismiss*

The general standards for evaluating a motion to dismiss under the PSLRA are set forth in *Lernout I.* The First Circuit has recently cautioned in this regard that "[e]ven under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002).

Courts assessing claims against independent accountants and auditors under the PSLRA have set a high bar:

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

*In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 154 (D.Mass.2001) (quoting *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir.2000)).

> The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same de-

cision if confronted with the same facts. A plaintiff may satisfy this high burden by pleading with specificity that the auditor was aware of, but failed to investigate, certain 'red flags' that plainly indicated misconduct was afoot.

*Id.* (citations and quotations omitted).

Plaintiff also must point to particular facts and circumstances—such as the magnitude of the fraud, an auditor's knowledge of the inadequacy of internal corporate controls, a company's disregard of its own internal accounting policies or auditor requests, and/or instances in which the company's accounting practices were called into question in a manner that would give a reasonable auditor pause—establishing a strong inference of recklessness. *See id.* (collecting cases).

### B. *Aiding and Abetting Liability under Central Bank*

The central dispute involves the standard for evaluating the liability of "secondary actors" like auditors in a securities fraud action. The law in this area remains largely unsettled. The seminal case is *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The *Central Bank* plaintiffs were holders of bonds issued by a public building authority to finance public improvements at a planned residential and commercial development. When suspicion emerged that the official appraisal had inflated the value of the land securing the bonds, Central Bank allegedly agreed—at the urging of the land developer—to delay an independent review of the dubious appraisal until six months after the closing on the bond issue. The building authority subsequently defaulted on the bonds. The bond holders sued not only the building authority, bond underwriters, and land developer, but also Central Bank on the the-

ory that it should be held "secondarily liable under § 10(b) for its conduct in aiding and abetting the fraud." *Id.* at 168, 114 S.Ct. 1439. The Supreme Court rejected this aiding and abetting theory of secondary liability.

*Central Bank* contains two important holdings. First, the Securities Exchange Act § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." *Id.* at 177, 114 S.Ct. 1439. Second—and most important—the district court's grant of summary judgment to Central Bank was appropriate because merely aiding and abetting a manipulative or deceptive act committed by someone else does not trigger liability under the Act. *Id.* at 191, 114 S.Ct. 1439. Actors can only be held liable under SEC Rule 10b–5 if they themselves "employ[ ] a manipulative device or make[ ] a material misstatement (or omission) on which a purchaser or seller of securities relies ..." *Id.* Pointing out that a plaintiff must show reliance on the defendant's misstatement or omission to recover under Rule 10b–5, the court stated: "Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions." *Id.* at 180, 114 S.Ct. 1439.

The Courts of Appeal have disagreed on how to apply *Central Bank* to determining when independent auditors have primary liability. One standard, espoused by the 9th Circuit in *In re Software Toolworks, Inc.*, 50 F.3d 615, 628 (9th Cir.1994), holds that an accountant that "play[s] a significant role in drafting and editing" a materially false and misleading statement may be held primarily liable under § 10(b). In that case, the accountant allegedly "im-

properly comput[ed] the financial statements" included in a software company's prospectus, "assist[ed]" the company in drafting misleading letters to the SEC, and "enabl[ed]" the company to issue false financial statements for the June quarter. *Id.* at 627. *See also In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960, 970 (C.D.Cal.1994) (holding that an auditor "intricately involved in [the] creation" of misstatements and omissions may be liable under § 10(b), even if the statements could not be reasonably attributable to him). Some district courts in other circuits have followed this analysis. *See, e.g., McNamara v. Bre–X Minerals, Ltd.*, 57 F.Supp.2d 396, 430 (E.D.Tex.1999) (holding that an independent engineering company that "played a significant role in developing allegedly false statements" made by a mineral exploration company could be held liable as a primary violator).

The Second and Eleventh Circuits have held that for primary liability to attach, the public must be able to attribute a misleading statement (at least indirectly) to the secondary actor at the time it is issued. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2nd Cir.1998) ("[A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination ... that is, in advance of the investment decision."); *Ziemba v. Cascade Int'l*, 256 F.3d 1194, 1205 (11th Cir.2001) ("Following the Second Circuit, we conclude that ... the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made.").

Although the language in *Wright* and *Ziemba* is broad, each case's facts shed light on the reach of its holding. The "false and misleading" press release issued by the company in *Wright*, for example, noted explicitly that the information was

unaudited. The Second Circuit stressed that it was issued "without a whisper of [the defendant's] involvement." *Id.* at 175–76. Moreover, the auditor in *Wright* (Ernst & Young) merely gave its private, oral approval of the materially false and misleading financial statement contained in the press release. *See id.* at 171. As the Second Circuit said, the conduct would not meet even the substantial participation test of *In re Software Toolworks. Id.* at 176.

In *Ziemba,* the plaintiffs alleged, among other things, that the defendant Coopers & Lybrand (C & L) erroneously advised a corporate parent, which it was not auditing, not to consolidate its financial statements with two of its corporate subsidiaries which C & L did audit. Once again, however, the facts of the case readily distinguish it from the case at bar because the defendant accountant neither made the material misstatements in the audit of the corporate parent (which had its own independent auditor), nor was its advice publicly attributed to C & L. The touchstone for the Tenth Circuit is reliance: "Were we to permit liability to attach to C & L because of advice that it gave [the corporate parent], without any allegation that such advice was attributed to C & L, we would permit Plaintiffs to avoid the reliance requirement of § 10(b) claims." *Ziemba,* 256 F.3d at 1207.

Eschewing the "substantial participation" cases, the Tenth Circuit extended primary liability to accountants who actually make false and misleading statements or omissions as long as they "kn[o]w or should ... know[ ] that [their] representation [will] be communicated to investors." *See Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1226 (10th Cir.1996). Although it did not impose the additional requirement that the document reveal the accountant's authorship at the time of its publication, the resolution of *Anixter* did

not depend on the attribution issue. The alleged misrepresentations made by the accountant/auditor in the case—such as opinions and certifications of financial statements—were in fact attributable to him at the time of their release. *See id.* at 1226. *Cf. Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 433–34 (N.D.Ill. 1995) (primary liability permissible where an accounting firm "played a central role in the drafting and formation" of misstatements that a partnership incorporated into a fraudulent Prospectus, even if Prospectus did not disclose the accountant's role as "mastermind").

So far, the courts in this district have uniformly rejected efforts to impose liability on accountants for merely reviewing and approving financial statements where there was no evidence the accountant played a significant role in drafting the statement, and there are no attributions in the statement to the accountant. *See In re Kendall Square Research Corp. Sec. Litig.,* 868 F.Supp. 26, 28 (D.Mass.1994) (holding an auditor's "review and approval" of quarterly financial statements nonactionable under § 10(b), and stating that "[b]ecause [defendant] did not actually engage in the reporting of the financial statements ... but merely reviewed and approved them, the statements are not attributable to [defendant] and thus [defendant] cannot be found liable for *making* a material misstatement") (citing *Software Toolworks,* 38 F.3d at 1078, as an analogous holding that supports the proposition); *Wells v. Monarch Capital Corp.,* 1996 WL 728125, at *13 (D.Mass.1996) ("[T]he record does not show that [defendant auditor] either made or played a significant role in the making of any of the documents listed in the ... Complaint.... [Plaintiffs] base their claims on documents that were allegedly 'prepared under the direction of' [auditor] who was 'responsible for their accuracy or completeness'. These are claims for aiding and abetting

under either approach...."); *Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731, 738 (D.Mass.1995) ("It would be beyond logic to maintain that although *Central Bank* prohibits aiding and abetting liability it permits plaintiffs to maintain the same cause of action by labeling it a conspiracy.... There is no well-pled allegation here that Coopers directly participated in the preparation, review or approval of the ... false and misleading statements.") (internal quotations omitted); *see also In re Rent–Way Sec. Litig.*, 209 F.Supp.2d 493, 503 (W.D.Pa.2002) (finding that *Central Bank* precludes holding accountant liable based on its review and approval of unaudited quarterly reports).

From a bird's-eye view, the case law contains at least two important doctrinal fault lines: (1) whether a "significant role" in drafting and editing a false and misleading document is sufficient to impose liability; and (2) whether the statement must be "publicly attributable" to the defendant at the time it is issued. With respect to the first issue, most courts have construed *Central Bank* as requiring a secondary actor's actual drafting and preparation of actionable material as opposed to mere review and approval. The second issue seems to be more controversial, with only two out of four circuit court opinions. requiring public attribution at the time the statement is issued as a predicate to primary liability.

With this debate in mind, I turn to the facts underpinning the allegations against each of the KPMG defendants.

### C. *Liability of KPMG Belgium*

#### 1. Making a Material Misstatement

■ There are two sets of allegations against KPMG Belgium. First, all plaintiffs point to KPMG Belgium's issuance of unqualified audit opinions for 1998 and 1999. The 1998 opinion, dated April 9,

1999, was, with KPMG Belgium's consent, attached to L & H's 1998 Form 20–F which was in turn filed with the SEC on June 30, 1999. KPMG Belgium also consented to attach its 1999 audit opinion, dated April 27, 2000, to L & H's 1999 10–K which was filed with the SEC on June 30, 2000. Both audit opinions stated that KPMG's financial audits were conducted "in accordance with generally accepted auditing standards in the United States," and that L & H's financial statements were "fairly stated in accordance with generally accepted accounting principles in the United States."

■ It is well established in this Circuit that each defendant may be held responsible for the false and misleading statements contained in the financial statements he signed. *See Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367–68 (1st Cir. 1994) (superceded by statute on other grounds). I need not restate each of the alleged misleading statements and omissions contained in each of L & H's Form 10–K Annual and Form 10–Q Quarterly Reports here, since they and the "panoply of fraudulent schemes" upon which they were based were detailed in this Court's previous opinion. *See Lernout I* at 78–80. KPMG Belgium's drafting, signing, and publication of a "clean" audit report on corporate filings that are rife with false and misleading information—assuming the requisite level of scienter—is sufficient to trigger primary liability under any of the competing constructions of *Central Bank*.

■ In addition to the written statements contained in the audit statements, the four Dragon and Dictaphone shareholders—Stonington plaintiffs, Baker plaintiffs, Filler plaintiffs, and Bamberg plaintiffs—allege that one or more KPMG Belgium partners made false and misleading oral statements directly to individuals who were conducting due diligence on behalf of potential shareholders. (Stoning-

ton Compl., CA No. 02–10303, Docket No. 3; Baker Compl., CA No. 02–10305, Docket No. 10; Filler Compl., CA No. 02–10302, Docket No. 28; Bamberg Compl., CA No. 02–10304, Docket No. 29).

Three shareholders—the Fillers, Bakers, and Bambergs—point to a March 22, 2000 conference call in which at least one KPMG Belgium manager participated. (Filler Compl. ¶ 79; Bamberg Compl. ¶ 119; Baker Compl. ¶ 120). The purpose of the call was to provide information to shareholder representatives conducting due diligence related to a contemplated merger between L & H and another leading supplier of speech recognition software named Dragon Systems. (Filler Compl. ¶ 79) Among the statements that the KPMG auditor on the call allegedly made to Ellen Chamberlain, interim CFO of Dragon Software, were that KPMG anticipated no material adjustments of L & H's 1999 financial statements, and that KPMG was "comfortable" with L & H's revenue recognition. (*Id.* ¶ 80). Most remarkably, the KPMG Belgium representative on the call allegedly told Ms. Chamberlain that "all issues from SEC inquiries into L & H accounting practices had been resolved." (*Id.* ¶ 82).

In a similar vein, the Stonington plaintiffs point to a series of meetings and conference calls during February and March of 2000, when Stonington was conducting due diligence for a proposed "stock-for-stock" merger in which Stonington would exchange its ownership stake for L & H stock. During conference calls on February 14, 2000 and February 29, 2000, KPMG Belgium representatives [including Van Aerde] allegedly "assured [Stonington] at every turn ... that L & H's revenue recognition practices were appropriate," (Stonington Compl. ¶ 123), including

giving specific assurances that revenue recognition practices were consistent and appropriate at all L & H locations, including the Far East, and that both the 1998 and 1999 financial statements were free of material misstatements. (*Id.* at ¶ 127).

In short, the Dragon and Dictaphone shareholders allege that KPMG Belgium orally conveyed false and misleading statements, substantively similar to those contained in its 1999 audit report, directly to shareholder representatives. Although these misstatements were not conveyed to the market in written form, they are equally actionable under Rule 10b–5. As the Supreme Court recently opined, "[W]e read 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face." *SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1904, 153 L.Ed.2d 1 (2002). The record does not attribute each false statement to a particular KPMG office representative. However, all of the complaints allege with sufficient particularity that a KPMG Belgium representative made at least some of the material misstatements and omissions. (Stonington Compl. ¶ 124; Filler Compl. ¶ 82; Baker Compl. ¶ 120; Bamberg Compl. ¶ 119).

**2. Scienter**

■ To clear the evidentiary hurdle imposed by the PSLRA, Plaintiffs also must state with particularity facts giving rise to a strong inference that KPMG Belgium acted with the requisite level of scienter when it consented to append its 1998 and 1999 audit reports to the annual reports filed with the SEC on June 30, 1999 and June 30, 2000, and when it allegedly made oral misrepresentations to related-party shareholders.[9] In addition to the scale of

9. The 1999 10–K includes a formal statement, also dated June 30, in which KPMG Belgium

grants its consent to append the audit report.

L & H's alleged accounting fraud—reported earnings for FY1998 were overstated by 15%, and reported earnings for FY1999 were overstated by 103%—the following strong inferences about KPMG Belgium's scienter emerge from the facts alleged and documents cited in the complaint:

**a. Lack of internal audit controls.** Prior to June 30, 2000, KPMG Belgium knew that L & H's own internal audit controls were skimpy or nonexistent, as exemplified by (1) its documented awareness, prior to August 30, 1999, of the need for "increases in the internal control staff" at L & H (¶ 290); (2) its knowledge of the fact that L & H's internal Audit Committee met on August 10, 1999, thirteen days *after* the issuance of a press release announcing second quarter 1999 financial results (¶ 309); and (3) Van Aerde's receipt of a memorandum from McLamb dated May 8, 2000, noting that L & H had failed to establish formal written procedures for recording accounts receivable, relieving accruals for contingencies, and valuing fixed assets. (¶ 294).

**b. Butting heads.** Prior to June 30, 2000, KPMG Belgium had repeatedly "butted heads" with L & H over corporate accounting practices, as evidenced by: (1) a meeting held on June 23, 1999, in which KPMG U.S. informed KPMG Belgium of an instance in which L & H had reclassified obsolete inventory worth $444,000 to another asset account to avoid writing it off (¶ 300); (2) a July 26, 1999 letter from Van Aerde (a KPMG Belgium partner) to L & H's Bastiaens, asking that the carryover of obsolete inventory and other issues be resolved prior to the press release for the second quarter of 1999 (¶ 303); (3) Van Aerde's writing of a "confidential memorandum" to McLamb (a partner of KPMG US) on September 30, 1999, stating that "certain *scope limitations* were imposed on [KPMG] when performing our review" that prevented KPMG from investigating the independence of the LDCs, and that one of the LDCs contacted in fact refused to confirm its independence from L & H (¶ 271); and (4) Van Aerde's writing of a letter to L & H's Dammekens on November 17, 1999, noting that the $444,000 of obsolete inventory was still carried on L & H's books, despite numerous requests that it be written off (¶ 306).

**c. Outside warnings.** By the time it issued the 1999 audit report, L & H's accounting practices had been called into question by sources outside KPMG Belgium in a manner that would give a reasonable auditor pause: (1) Van Aerde was informed of the Korean revenue recognition concerns identified by Oh Kwon, a KPMG Korea partner, and cited them in a letter to Dammekens dated November 17, 1999 (¶ 306); (2) an informal inquiry into L & H's accounting practices was commenced by the SEC in January 2000 and the SEC specifically requested documents relevant to the probe in April 2000. (¶ 274); (3) Van Aerde and Huysman received copies of an e-mail from McLamb dated January 29, 2000, noting that payments from several Korean LDCs came from the same bank account and stressing the importance of finding out the identity of the corporate owners (¶ 275); and (4) Van Aerde received an e-mail from McLamb dated June 26, 2000, revealing that KPMG had not yet performed audit procedures necessary to establish the independence of the LDCs (¶ 279–80).

With only a few exceptions, this array of "red flags" preceded not only the issuance of the 1999 10–K but also the various oral misstatements to related-party shareholders. With regard to each set of claims, Plaintiffs have carried their burden under the PSLRA of demonstrating with sufficient particularity facts giving rise to a strong inference of scienter. KPMG Bel-

gium's motion to dismiss is accordingly denied.

### D. *Liability of KPMG US*

#### 1. Making a Material Misstatement

■ Robert McLamb played a pivotal role in the L & H audits and reviews. A partner of the U.S. Capital Markets Group, McLamb was based in KPMG's London office for most of the class period. At some point in either late 1999 or January 2000, he moved to the Houston, Texas office of KPMG US.[10] Plaintiffs describe McLamb as KPMG's "SEC reviewing partner" and "the audit partner responsible for ensuring that L & H's financial statements complied with U.S. GAAP." (¶ 233, Baker Compl. ¶ 328, Baker Opp. KPMG Mot.Dis. at 23). They allege that he worked extensively on L & H audits and reviews, as well as helping to prepare, review, and comment on various of L & H's financial disclosures. (¶¶ 233, 234, 237, 239).

The allegations regarding KPMG U.S. once again fall into two categories: those common to all plaintiffs, and those specific to the Dragon and Dictaphone shareholders. The common set of allegations include the following:

a) The Boston, Massachusetts office of KPMG U.S. was listed as one of L & H's "principal auditors" (in addition to KPMG Belgium) in certain L & H documents described as "Annual Reports" and/or "Annual Reports to Shareholders" in 1997, 1998 and 1999.[11]

b) KPMG U.S. officials would "show up at L & H's Burlington headquarters at the end of each quarter to prepare L & H's financial statements. . . ." (¶ 235).

c) KPMG U.S. officials (including McLamb after he transferred from KPMG UK in January 2000) "actively participated in the reviews and audits of L & H's financial statements" (¶ 229), were "actively involved in" audits (¶ 232), "worked extensively on the L & H audits and reviews" (¶ 233), and "oversaw the year-end audits of L & H and . . . reviewed and provided input into the completion of the audits" (¶ 235).

The above allegations, taken together, are sufficient to meet the misrepresentation portion of a 10b–5 claim against KPMG US. While KPMG U.S. did not sign any of KPMG's allegedly fraudulent audit reports or L & H's financial statements, Plaintiffs allege that it played a significant role in drafting the financial statements and in conducting the audit, and that KPMG US's role as an auditor was publicly disseminated in the annual reports to shareholders. Taking "the allegations in the complaint as true and grant[ing] all reasonable inferences in favor of the plaintiff," Plaintiffs allege with sufficient particularity that four times a year throughout

---

**10.** There is some confusion among Plaintiffs regarding the date on which McLamb moved from KPMG UK to KPMG US, although all seem to agree that the move occurred no later than January 27, 2000. (¶ 277; Baker Compl. ¶ 171). Lead plaintiffs' complaint implies that the move occurred in January 2000. (¶¶ 233, 277). The Baker Complaint states that McLamb moved to KPMG U.S. "in 1999." (¶ 28).

**11.** Two important details of these allegations, however, remain murky. First, it is unclear whether these reports involve the "annual reports" that L & H filed with the SEC on Forms 20–F and 10–K, or the "annual reports" that are mailed to shareholders each year. Second, while the lead plaintiffs claim that KPMG U.S. was named as a principal auditor only in 1997 and 1998 (¶ 220), two Dragon and Dictaphone shareholders allege that the 1999 report also contained the identification. (Baker Compl. ¶¶ 26, 328; Bamberg Compl. ¶ 27). For purposes of these motions to dismiss, the ambiguity will be resolved in Plaintiffs' favor, and I will assume that KPMG U.S. was named as a principal auditor in 1999.

the Class Period, KPMG U.S. drafted portions of L & H financial disclosures later filed with the SEC. *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir.1992). It is also appropriate to infer that in 1998 and 1999, investors reasonably attributed the statements contained in the quarterly and annual reports to KPMG US.

The second set of allegations against KPMG US, brought by the Dragon and Dictaphone shareholders, involves the same cluster of meetings and conference calls in which KPMG Belgium allegedly participated. Specifically, three of the four Dragon and Dictaphone shareholders allege that at least one "audit partner" from KPMG U.S. participated in each of these meetings, along with representatives of KPMG Belgium. (Bamberg Compl. ¶ 119; Baker Compl. ¶ 120; Stonington Compl. ¶ 123). The complaints specifically attribute material misstatements to the senior KPMG U.S. partner. (Stonington Compl. ¶ 124; Baker Compl. ¶ 120; Bamberg Compl. ¶ 119).[12]

## 2. Scienter

■ The remaining question is whether KPMG U.S. had the requisite level of scienter when KPMG's audit reports and/or L & H's annual reports were released. L & H's 1999 Annual Report was released on June 30, 2000, while the misstatements to related-party representatives allegedly occurred during February and March of 2000. Allegations regarding KPMG US's scienter prior to these dates include the following:

**a. Lack of internal audit controls.** Facts supporting the inference that KPMG U.S. knew that L & H's own internal audit controls were skimpy or nonexistent include: (1) on October 19, 1998, David Milligan of KPMG's Northern Virginia office sent a memo to Boyer, a KPMG U.S. partner, documenting the basis for his doubt that one of the L & H's U.S. subsidiaries, Globalink, was complying with U.S. GAAP "in material respects." (¶ 299); (2) KPMG U.S. attended a July 23, 1999 meeting in which it identified several problems with tardy payments and revenue recognition, and noted one case in which L & H had ignored its recommendation to write off $444,000 of obsolete inventory and instead reclassified the item (¶ 300); (3) Boyer authored a memo dated October 20, 1999, documenting several respects in which L & H failed to follow its own accounting policies (¶¶ 298–99, 303, 307); and (4) McLamb wrote an e-mail to Dammekens on January 5, 2000, enumerating numerous revenue recognition problems in the "draft" agreements for Q4 1999, and suggesting that the problematic contracts be signed and backdated (¶ 260).

**b. Butting heads.** Facts supporting the inference that KPMG U.S. "butted heads" with L & H over corporate accounting practices include: (1) although KPMG Boston recommended that $444,000 of obsolete inventory be written off during its 1998 year-end audit, L & H disregarded the recommendation and instead reclassified the inventory on its 1998 Form 20–F (¶¶ 300, 306)[13]; (2) the $444,000 was still

---

**12.** The Filler complaint's description of the March 22, 2000 conference call contains no particularized allegations against KPMG US. However, since the Fillers also recite the same set of "core" claims as the lead plaintiffs (i.e., KPMG US's role in preparing written misstatements), as a technical matter their claims are still sufficient to withstand KPMG US's motion to dismiss.

**13.** There is some ambiguity in this regard. Plaintiffs mention only that the reclassification occurred "subsequent[ ]" to KPMG Boston's 1998 year-end audit (¶ 300). The most reasonable inference to be drawn is that the reclassification was reflected in L & H's 1998 Annual Report on Form 20–F filed with the SEC.

carried on L & H's books on November 17, 1999, despite "numerous requests that it be written off" (¶ 306); (3) KPMG U.S. Professional Practice group requested a "special review" of the LDC issue in connection with L & H's review of the third quarter of 1999 financial statements. Not only did L & H fail to facilitate that request, but McLamb received a "confidential memorandum" from Van Aerde on September 30, 1999, stating that "certain *scope limitations* were imposed on [KPMG] when performing our review" that prevented KPMG from investigating the independence of the LDCs. (¶¶ 270, 271).

**c. Outside Warning.** The fact that the SEC commenced an informal SEC inquiry into L & H's accounting practices in January 2000, and followed up the inquiry with specific document requests the following April (¶ 274), would give a reasonable auditor palpitations.

This panoply of "red flags," taken together, is more than sufficient to strongly support the inference that KPMG U.S. acted with recklessness or actual knowledge when it allegedly fed misinformation to Dragon and Dictaphone shareholders and prepared portions of L & H's 1999 10-K.

### E. *Liability of KPMG UK*

#### 1. Making a Material Misstatement

■ All plaintiffs bring the same core set of allegations against KPMG UK, including the following:

a) While based in KPMG UK, McLamb "actually prepared and provided certain amounts and disclosures to L & H's 1998 financial statements." (¶ 239)

b) Wirtz, also of KPMG UK, and McLamb provided L & H and KPMG Belgium various forms of assistance with audits and financial disclosures. For example, KPMG UK allegedly "reviewed" U.S.

GAAP issues (¶ 234); "commented" on and "cleared" U.S. GAAP issues (*id.*); "reviewed" and "cleared" drafts of L & H financial statements (¶¶ 233–34, 259); "oversaw," "reviewed" and "provided input" into year-end audits (¶ 235); reviewed and commented on press release for Q1 1999 report (¶ 237); "advised" L & H on key auditing issues (¶ 240); and performed valuation services for L & H acquisitions (¶ 243).

Importantly, no plaintiff alleges that KPMG UK signed any of the audit reports or was listed in L & H's financial disclosures as a principal auditor. Moreover, allegations of "reviewing" audits, "commenting on" documents, and the like, are insufficient to trigger primary liability under *Central Bank*. KPMG UK's primary liability must rise or fall on McLamb's alleged "actually prepar[ation] and provi[sion] [of] certain amounts and disclosures" for inclusion in the 1998 Form 20–F, filed with the SEC on June 30, 1999. (¶ 239).

What makes this a close call is that KPMG UK's allegedly substantial role in conducting audits and preparing the 1998 20–F was never disclosed to shareholders either directly or indirectly. Yet McLamb was a key behind-the-scenes player in drafting the statement and conducting the audit, and he knew that the statements he prepared would be publicly disseminated. Absolving an auditor who prepares, edits, and drafts a fraudulent financial statement knowing it will be publicly disseminated simply because an affiliated auditor with which it is working under a common trademark is the one to actually sign it, would stretch *Central Bank's* holding too far. Under the best reading of *Central Bank* and its progeny, KPMG UK's role in the making of the 1998 Annual Report was sufficient to trigger primary liability if it

also acted with the requisite level of scienter.

## 2. Scienter

■ Even though an accountant that "ghost-writes" portions of a SEC financial disclosure can be deemed a primary violator, Plaintiffs have not shown with sufficient particularity that McLamb acted with the requisite scienter in June 1999 when the 1998 Annual Report on Form 20–F was filed with the SEC. The complaint cites no particular instances during this time frame in which McLamb, Wirtz, or any other KPMG UK representative was specifically informed (or informed others) of a "red flag" in L & H's accounting practices that would give a reasonable auditor pause. Although the record does contain some specific allegations of scienter involving KPMG UK, none is specifically alleged to have taken place before the 1998 Annual Report was released to the public.[14] The allegations against KPMG UK cannot withstand a motion to dismiss under the PSLRA.

## 3. Group Pleading

■ Plaintiffs argue that the "group pleading doctrine" affords this Court a separate, sufficient basis for KPMG UK's liability as a primary violator. In another recent securities fraud case, this Court held that "[u]nder the group-published information [or 'group pleading'] doctrine, a securities fraud plaintiff may impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers." *In re Raytheon*, 157 F.Supp.2d at 152. However, this Court also cautioned that "[t]he doctrine is limited in scope and applies only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions." *Id.* (internal citations and quotations omitted).

Lead plaintiffs ask this Court to extend the group pleading doctrine on grounds that "[w]hile the group pleading doctrine has traditionally been applied to senior officers liable for a company's misstatements, under the present facts, the logic equally applies to holding KPMG UK ... responsible for Belgium's misstatements." (Lead Pl.Mem.Opp. at 72). Plaintiffs' sole support for this claim is the allegation (with no supporting references to the Complaint) that "key staff at KPMG ... UK wrote and/or received numerous reports, e-mails, and memoranda detailing and highlighting countless accounting irregularities at L & H. Nevertheless, armed with their knowledge and concerns, KPMG UK ... continued to participate in KPMG Belgium's approval of L & H's financial results throughout the Class Period." (*Id.* at 73).

Lead plaintiffs' attempt to use the group pleading doctrine to circumvent the necessity of particularizing KPMG UK's role in the alleged fraud is unpersuasive. *See* 15 U.S.C. § 78u–4(b)(2) ("[T]he complaint shall ... state with particularity the facts giving rise to a strong inference that the

14. Plaintiffs' complaint does not preclude the possibility that McLamb and other KPMG UK partners were privy to "red flags" prior to June 30, 1999. For example, in a letter dated July 26, 1999 to Bastiaens, Van Aerde alluded to a meeting among KPMG partners and L & H officials that took place on June 23, 1999, in which many issues related to revenue recognition were discussed. (¶ 302). He also mentions that the information gleaned from that meeting was supplemented by "further input" from McLamb during a conference call. If McLamb participated in the June 23, 1999 meeting, and/or if the follow-up conference call in which he participated occurred before June 30, 1999, McLamb may well have learned of several "red flags" to which his KPMG colleagues in other offices were already privy. But a theoretical possibility of scienter does not a "strong inference" make.

defendant acted with the required state of mind."). Although McLamb is alleged to have provided certain amounts and disclosures to L & H's 1998 Annual Report on Form 20–F while still based in KPMG UK, Plaintiffs do not assert that he (or any other KPMG UK official) played "an active daily role" in managing KPMG Belgium or handling the questionable L & H transactions during that period. Mindful of the group pleading doctrine's limited scope, particularly after the passage of the PSLRA, I decline to treat KPMG UK as a "clearly cognizable corporate insider" to whom KPMG Belgium's scienter and material misstatements must automatically be attributed. The necessity for this Court to "evaluate the allegations concerning each of the individual defendants," *In re Raytheon,* 157 F.Supp.2d at 153, is especially compelling where defendants are not officers of a single corporation, but independent corporate entities linked only by their membership in a trade association and collaboration on certain client projects.

### 4. "Single Entity" Theory

 In a related vein, Plaintiffs argue that since KPMG UK and several other members of KPMG International effectively hold themselves forth as a single entity, they should be held jointly and severally liable for each other's acts and statements. (¶¶ 227–28; Baker Am.Compl. ¶¶ 27–29).

The sole basis on which Plaintiffs rest their claim is the allegation that "KPMG Int'l markets itself and all of its member firms as a single entity." (¶ 227; *see also* Baker Am.Compl. at ¶ 28 ("KPMG promotes all of the partners and employees of its member firms as its agents and all of the partners and employees of any member firm as the agents of every other member firm, acting collectively to form 'One Firm'....")). In fact, however, the very source upon which Plaintiffs rely— the home page of the KPMG website— belies their claim. The home page states at the bottom that each of KPMG's member firms is a "separate and independent legal entity" and describes itself as such. (Docket No. 174, App. at 1).[15]

Several courts have declined to treat different firms as a single entity, holding them jointly and severally liable for one another's acts, simply because they shared an associational name and/or collaborated on certain aspects of the relevant transaction. *See In re AM Int'l, Inc. Sec. Litig.,* 606 F.Supp. 600, 607 (S.D.N.Y.1985) (dismissing complaint against Price Waterhouse entities outside the United States after rejecting argument that all Price Waterhouse affiliates worldwide were "in fact one entity, and acted as agents of one another"); *Reingold v. Deloitte, Haskins & Sells,* 599 F.Supp. 1241, 1249, 1254 n. 10 (S.D.N.Y.1984) (holding that existence of DH & S International, "an organization composed of a large number of affiliated accounting firms," did not prove DH & S was "a single worldwide entity" even though some brochures described DH & S (U.S.) as "a single cohesive worldwide organization"). *Cf. Noonan v. Winston Co.,* 902 F.Supp. 298, 300 n. 6 (D.Mass.1995) (noting in dicta that defendant was not a legal entity, but "an associational name used by a group of affiliated advertising

15. KPMG UK emphasizes (and Plaintiffs' Opposition Memorandum does not dispute) that both the Membership Agreement and Licensing Agreement between KPMG UK and KPMG International explicitly disclaim any agency, partnership, or joint venture relationship, providing that "[n]othing containing herein shall be construed to place the parties in the relationship of agents, partners or joint venturers, and the Member Firm shall have no power to obligate or bind [KPMG International] or any other Member Firm in any manner whatsoever." (Rake Decl., Docket 173, ¶ 5). Since neither document is referenced in Plaintiff's complaint, it cannot be considered on a motion to dismiss.

agencies which are incorporated in different countries"); *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F.Supp. 654, 660, 662 (S.D.N.Y.1997) (finding, in evaluation of personal jurisdiction, that "public relations materials suggest[ing] that Klynveld is a global firm or an international network of member firms" do not justify a finding of a partnership or agency between Klynveld and Peat Marwick US).

In short, neither the facts of this case nor the relevant caselaw lends credence to Plaintiffs' "single firm" theory.

### F. *Liability of KPMG Singapore*

■■■ The lead plaintiffs do not name KPMG Singapore as a defendant. The Fillers allege that KPMG Singapore gave KPMG Belgium its "professional opinion that L & H's Singapore operations and revenues were presented fairly in conformity with U.S. GAAP," a material misrepresentation that was later disseminated to the market as part of the 1999 audit report over the signature of KPMG Belgium. They present three alternative theories to support liability on this basis: a) KPMG Singapore is liable for "its own fieldwork and conclusions communicated to the market over the signature of its sister entity, KPMG Belgium"; b) KPMG Singapore substantially participated in misstatements made by a related entity; and c) the KPMG partners who participated in the March 22, 2000 conference call had actual and apparent authority to speak for KPMG Singapore. (Filler Pl.Mem.Opp. KPMG Singapore Mot. Dismiss at 21–26).

None of these theories is actionable based on this Court's reading of *Central Bank*. Even if KPMG Belgium partially relied on KPMG Singapore's conclusion that L & H's Singapore operations and revenues were fairly presented in issuing its "clean" audit report, there is no caselaw to support plaintiff's theory that KPMG Singapore made a material misstatement or omission upon which investors relied. Second, KPMG Singapore did not prepare, draft, edit or provide numbers for the audit. Its role was more akin to the "review and approval" allegations which no court has found sufficient to trigger liability after *Central Bank*. Finally, Plaintiffs have alleged no facts to support the claim that "each KPMG entity was an agent for each of the others."

### G. *Liability of KPMG International*

■■■■ Only the Bambergs name KPMG International, the Swiss Verein to which each of the other KPMG defendants belongs, as a defendant. "[A] Swiss Verein is an entity without an exact legal counterpart in the United States, but which is somewhat akin to an incorporated membership association. It is legally distinct from its members." *Jeffries v. Deloitte Touche Tohmatsu Int'l*, 893 F.Supp. 455, 457 n. 1 (E.D.Pa.1995). Describing KPMG US, KPMG UK, and KPMG Belgium as its agents, they argue that KPMG International should be held liable for their misstatements under a theory of vicarious liability. (Bamberg Pl. Opp.Mot.Def. KPMG Intern.Dis.Am.Compl. at 10). To substantiate the existence of an agency relationship, Plaintiffs point to:

a) the excerpts from KPMG International's Website and Annual Report to Shareholders describing KPMG International and/or its member entities as a unitary global entity (Bamberg Pl. Opp.Mot.Def. KPMG Intern.Dis. at 15–16);

b) KPMG's touting, in its Website and Annual Report to Shareholders, of global services or strategies, including "service lines" which are "globally operated"; "global service teams" lead by "global lead partner[s] [that] provide a top-level point of contact"; a "global performance management process" that "determines salary and incentive compensation awards" for

"every KPMG employee around the world" and "provides a consistent way to measure the performance of our people worldwide"; and "proprietary, leading-edge tools" used by all member firms including a "Business Measurement Process" audit methodology; and

c) the alleged "co-extensive responsibility" and collaboration among different KPMG entities in conducting audits for L & H, "all under the umbrella name of KPMG," including London-based KPMG U.S. Capital Market Group's review of L & H audits and financial statements to ensure their compliance with U.S. GAAP.

In construing the Securities Exchange Act, the First Circuit concluded that Section 20, 15 U.S.C. § 78t(a), which imposes vicarious liability, did not foreclose alternative common law avenues. *In re Atlantic Fin. Mgmt., Inc.*, 784 F.2d 29, 35 (1st Cir.1986). However, the First Circuit has recognized that *Central Bank* casts "some doubt" on *Atlantic Financial*, although it remarked that *Central Bank* did not involve theories of vicarious liability, like agency. *Dinco v. Dylex Ltd.*, 111 F.3d 964, 968 (1st Cir.1997).

Many courts have held that *Central Bank* does not bar a principal's liability for its agents' misstatements. Some circuits have espoused the contrary view. *See Dinco*, 111 F.3d at 968 ("The phrase 'vicarious liability' is something of a trap where used promiscuously to embrace markedly different theories of third-party liability, such as agency, partnership, and civil conspiracy. *Central Bank* involved none of those concepts, but rather rejected 'aiding and abetting' liability under section 10(b). . . ."); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001) (holding that *Central Bank* did not shield business entities from being held liable for misstatements of their agents since "[a] corporation can only act through its employees and agents . . . . an

allegation that a particular agent may have doctored or conveyed the report will not immunize the principals from liability for a knowing deception."); *AT & T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1430–31 (3d Cir.1994) (concluding, based on detailed comparison of aiding and abetting liability and agency liability, that *Central Bank* did not preclude the latter); *Cromer Fin. Ltd. v. Berger*, 2002 WL 826847 at *7 (S.D.N.Y.2002) ("*Central Bank* does not undermine the application of the hoary principles of agency law to hold principals responsible for the misstatements and omissions of their agents."); *In re Centennial Techs. Litig.*, 52 F.Supp.2d 178, 185 (D.Mass.1999) ( "[Defendant] asserts that . . . the reasoning behind *Central Bank* forbids holding [it] liable under status-based [agent] liability principles. I anticipate that the First Circuit, when and if it addresses this issue, will not reach the outcomes proposed by [defendant]. . . .").

Some district courts—including a judge in this district—have held the contrary. *See, e.g., In re Fidelity/Micron Sec. Litig.*, 964 F.Supp. 539, 544 (D.Mass.1997) ("To hold [defendant mutual fund] liable under Rule 10b–5 on a theory of respondeat superior would impose liability without any showing that the market relied on statements or actions directly or indirectly attributable to [it] in evaluating Micron shares."); *Converse, Inc. v. Norwood Venture Corp.*, 1997 WL 742534, at *3 (S.D.N.Y.1997) (holding claims based on agency liability nonviable after *Central Bank*); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F.Supp. 584 (D.N.J.1996) (opining that the *Central Bank* court "strong implied" that respondeat superior liability is not available under Rule 10b–5).

Although agent liability remains a viable theory of liability after *Central Bank*, the facts on record do not support the infer-

ence that KPMG Belgium, U.S. and UK were the agents of KPMG International. Plaintiffs ask this Court to adopt the ruling of the only court that has allowed a Rule 10b–5 claim against a Swiss Verein to proceed based on a theory of vicarious liability. *See Cromer*, 2002 WL 826847 at *13. KPMG International's counterpart in *Cromer* was Deloitte Touche Tohmatsu ("DTT"), a Swiss Verein to which Deloitte & Touche (Bermuda) ("DTB") belonged. The judge in *Cromer*, after concluding that DTB had actual authority to act as DTT's agent, permitted plaintiff to amend the original pleading to allege that both misleading audit opinions and scienter could be imputed to DTT. *See id.* at *7–8.

Yet the allegations at issue in *Cromer* differ substantially from those upon which Plaintiffs rely. In *Cromer*, the judge did not rely solely on the fact that the DTT's representations in its "marketing materials" may have led third parties to believe that an agency relationship existed between them. Rather, the judge inferred that in light of the plaintiff's other allegations, such third-party representations "bore a relationship to the way Deloitte actually conducted its business," i.e., DTB had "actual authority to act as [DTT's] agent." *Id.* at *5. The other factual allegations included the following: the audit proposal stated that DTB was "part of Deloitte Touche Tohmatsu International"; the Offering Memorandum stated that the Fund retained "Deloitte & Touche," not DTB, as its independent auditor; and—most important—all audit reports bore the name and logo of DTT, as well as "Deloitte & Touche" with an accompanying Bermuda address, and were signed "Deloitte & Touche" in cursive signature. *Id.* at *3.

Unlike the judge in *Cromer*, this Court has not been presented with any specific allegations—aside from advertising slogans culled from the Website and Annual Report to Shareholders—that support the inference of an agency relationship.[16] Plaintiffs do not allege that any of the audit reports bore the name or logo of KPMG International, or any signature other than that of KPMG Belgium. Nor do they cite wording from an audit proposal or offering memorandum implying that KPMG International itself was retained as an independent auditor. Although they cite several portions of the Complaint to corroborate that different KPMG entities cooperated on different aspects of L & H audits, they do not cite any support for the notion that such collaborations occurred at the behest of, on behalf of, under the direction of, or subject to the control of KPMG International. *See, e.g., Restatement (Second) of Agency* § 1 (1958) (specifying that for an agency relationship to exist, two people must agree that one person shall act on behalf of the other person and subject to his control).

"Whether such an agency is formed depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir.1990) (internal quotations omitted). Taken together, the allegations in the Complaint and inferences that can be fairly drawn from them do not support Plaintiff's assertion that KPMG Belgium, U.S. and UK had actual authority to act as KPMG International's agents.[17] The Bambergs' claim against KPMG International is dismissed.

---

16. The import of these marketing slogans is further undercut by the fact that the website itself describes each of KPMG's member firms as a "separate and independent legal entity," and specifies that each member entity describes itself as such. (Docket No. 174, App. at 1).

17. Although Plaintiffs do not address the point, there are also no plausible grounds for

### H. *Liability of Paul Behets*

All but the Stonington plaintiffs name Paul Behets, the KPMG Belgium partner allegedly in charge of auditing L & H until July 1999, as a defendant. Although Behets and KPMG Belgium filed a joint motion to dismiss, their supporting memoranda contain no legal arguments tailored to Behets. Indeed, aside from briefly disputing Plaintiffs' claim that Behets' and another KPMG Belgium auditor's acceptance of jobs at L & H-created entities impaired KPMG Belgium's independence, the analytical sections of the memoranda never specifically address Behets' alleged liability. (Def. KPMG Belgium & Behets' Mot. Dismiss at 41–42). Since Behets has offered no arguments specifically on his own behalf, this Court can only assume that he has hitched his wagon to KPMG Belgium. His motion to dismiss is accordingly denied.

### I. *Liability Under Subsections (a) and (c) of Rule 10b–5*

Plaintiffs argue that the KPMG defendants' role in the making of materially false or misleading statements or omissions should not be the sole litmus test for evaluating their liability, since subsections (a) and (c) of Rule 10b–5 also proscribe, respectively, the "employ[ment of] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." (Lead Pl.Mem.Opp. KPMG Def.Mot.Dis. at 65).

It is true that 10b–5 primary liability encompasses more than material misstatements. *Central Bank* itself references all three subsections of the statute, and describes "employ[ment of] a manipulative device" and "commit[ting] a manipulative or deceptive act," as primary violations. 511 U.S. at 191, 114 S.Ct. 1439. *SEC v. Zandford*, a more recent case, underscores the principle that "the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) (internal quotations omitted). "Neither the SEC nor [the Supreme] Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act .... Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face." *Id.* at 1903–04.

However, the only way for a plaintiff to prevail against a defendant that does not make a false and misleading statement is to identify another of its actions, such as a "deceptive device or fraud," that triggers liability under one of 10b–5's other two prongs. *Id.* at 1906. In *Zandford*, for example, a broker's alleged conduct of selling a customer's securities with undisclosed intent to misappropriate the proceeds was deemed a deceptive device or contrivance in the purchase or sale of secu-

this Court to infer an agency relationship based on the existence of "apparent" or "implied" authority. *See, e.g., In re Atl. Fin. Mgmt., Inc.*, 784 F.2d at 29 (discussing at length additional two theories of agency). Even if these other two theories are valid bases for agency liability in the wake of *Central Bank*, Plaintiffs' allegations do not reasonably support the existence of either. The Website's express declaration that each member of KPMG International is a "separate and independent legal entity" precludes any reasonable inference of apparent authority, and Plaintiffs make no argument that the "status" of the various KPMG member entities vis a vis KPMG International should give them inherent agency powers (i.e., implied authority) to bind the entire association for their individual misstatements.

rities, and thus actionable under Rule 10b–5. *Id.* at 1904. *See also Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 597, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001) (holding that selling securities while secretly never intending to honor them is a § 10(b) violation); *United States v. O'Hagan*, 521 U.S. 642, 655–56, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (holding that secretly using misappropriated confidential information for trading purposes to be § 10(b) violation); *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (misleading investor into selling treasury bonds, on erroneous belief that it would receive proceeds of sale, held to be § 10(b) violation).

In short, subsections (a) and (c) of Rule 10b–5 do not create a short cut to circumvent *Central Bank's* limitations on liability for a secondary actor's involvement in preparing misleading documents.

### J. *Section 20(a) Liability*

 Plaintiffs allege that KPMG U.S. and KPMG UK are liable as controlling persons of KPMG Belgium under Section 20(a) of the Securities and Exchange Act of 1934, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (2000).

In a recent First Circuit case, the defendants suggested a three-part test for controlling person liability: "(1) an underlying violation by a controlled person or entity; (2) the defendants control the violator; and (3) the defendants are in a meaningful

sense culpable participants in the fraud in question." *Aldridge*, 284 F.3d at 84 (citing *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)). Although acknowledging a debate among the circuits as to whether the third part of the test (culpable participation) is a necessary element, the *Aldridge* court declined to reach the issue. *See id.* at 85.

 Although it remains unsettled in this Circuit whether one must prove culpable participation under Section 20(a), the standard for demonstrating the second prong of the test, control over the primary violator, has been clearly stated. "To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company." *Id.; see also Sheinkopf v. Stone*, 927 F.2d 1259, 1270 (1st Cir.1991) ("For [the defendant] to be liable ... there must be 'significantly probative' evidence that the [defendant] exercised, directly or indirectly, meaningful hegemony over the ... venture...."). In short, the second prong of the § 20(a) test requires a plaintiff to make two distinct factual allegations: that the "status" of the controlling entity gave it "general" power over the controlled entity; and that the controlling entity did, in fact, exercise such power. *Aldridge*, 284 F.3d at 85.

Plaintiffs' theory of liability based on § 20(a) lacks factual support. First, Plaintiffs make no specific allegations to bolster their claim that either KPMG UK or KPMG U.S. has the "general power" to control KPMG Belgium or L & H. The mere fact that both entities substantially participated in conducting audits published under KPMG Belgium's name does not come close to this Circuit's requirement that "the alleged control person actually exercise[ ] control over the general operations of the primary violator ..." *In re*

*Centennial Techs. Litig.*, 52 F.Supp.2d at 186 (quoting *Farley v. Henson*, 11 F.3d 827, 835 (8th Cir.1993)). The fact that KPMG's home page states at the bottom that each KPMG member firm is a "separate and independent legal entity" further undermines Plaintiffs' assertion. (Docket No. 174, App. at 1). Finally, there is no evidence that KPMG U.S. or KPMG UK ever "actually exercise[d] control" over KPMG Belgium in the issuance of audit reports. *Aldridge*, 284 F.3d at 85. In fact, Plaintiffs themselves point to at least one instance in which KPMG Belgium failed to take a series of steps to verify questionable sources of revenue even when "instructed" to do so by McLamb. (¶¶ 280–81). Rather than follow McLamb's instructions, KPMG Belgium signed off on the 1999 financial statements "notwithstanding the uncertainty around the validity of the transactions." (*Id.*).

### K. *Common Law Fraud Claims*

In addition to their claims for securities fraud under Rule 10b–5, all the Dragon and Dictaphone plaintiffs bring claims against the KPMG defendants for common-law fraud. (Bamberg Compl. ¶ 175; Baker Compl. ¶ 167; Stonington Compl. ¶ 145; Filler Compl. ¶ 104). The elements of common law fraud are substantively similar to those of securities fraud under Rule 10b–5. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 193 (1st Cir.1996) (to state a claim for fraudulent misrepresentation under Massachusetts law, plaintiff must allege that the defendant's statement was knowingly false, material to the plaintiffs' decision, and made with the intent to deceive; and that the plaintiffs reasonably relied on the statement and were injured as a result of that reliance); *Kennedy v. Josephthal & Co.*, 635 F.Supp. 399, 401 (D.Mass.1985) (noting that elements of common law fraud are essentially the same as those of 10b–5 fraud) (citation omitted).

Each of this Court's earlier conclusions that the 10b–5 claims suffice applies equally to Plaintiffs' claims of common law fraud against KPMG U.S. and Belgium.

### L. *Forum Non Conveniens*

KPMG Belgium has moved to dismiss this case on the grounds of forum non conveniens, arguing that Belgium is a more convenient forum. (Def. KPMG Belgium's Mem.Supp.Mot. Dismiss 9–15). In *Lernout I*, this Court concluded that dismissal on these grounds was inappropriate because of Belgium's lack of a class action mechanism, its failure to recognize the fraud-on-the-market theory, and the balance of public and private factors in favor of the United States. 208 F.Supp.2d at 74. Since these arguments apply with equal force to the KPMG defendants, I decline to dismiss this case on these grounds.

### ORDER

For the reasons stated above, the motions to dismiss brought by defendants KPMG Belgium and KPMG U.S. are **DENIED.** The motions to dismiss brought by KPMG UK, KPMG International, and KPMG Singapore are **ALLOWED.**